Maureen SILVAN, Appellant,

v.

Juan ALCINA, Appellee.

No. S–11216.

Supreme Court of Alaska.

Jan. 14, 2005.

William T. Ford, Anchorage, for Appellant.

Robert C. Erwin, Erwin & Erwin, LLC, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

This appeal from a judgment in a divorce case challenges the superior court's custody

order, its division of marital property, and its award of interim spousal support. The main issue on appeal concerns the mother's desire to move to Arizona. The superior court found that if the mother did move, the best interests of the children lay in remaining in Alaska with their father. Because the superior court properly analyzed the issue by: (1) assuming the move would happen, (2) finding there was a legitimate purpose for the move, and (3) determining the best interests of the children in the event of a move, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Factual History

Juan Alcina and Maureen Silvan were married in 1993 in Knik. They met in Spain but came to Alaska so that Alcina could race sled dogs. They decided to settle in Willow and bought their home with funds from Silvan's mother. The superior court characterized it as a gift to the marriage. The parties stipulated the Willow house's value to be $157,500.

The couple have two children: Javier, born in 1994, and Neal, born in 1999. Throughout the marriage, Silvan was the children's primary caregiver. Alcina worked nights as a mechanic for Alaska Airlines and focused on dog mushing. Silvan did not work outside the home.

The marriage began to fail in 2000. Silvan wanted to leave Alaska, and in response, Alcina applied for a job with Alaska Airlines in Phoenix. But Silvan had a new boyfriend and the marriage was not salvageable. Alcina filed for divorce in December 2002.

### B. Procedural History

Soon after the complaint was filed, Silvan moved for interim custody and support and asked the superior court for permission to move to the Phoenix area with the children. Silvan told the trial court that she wanted the children to be educated in Phoenix and claimed that Alcina would not be a good parent on his own because he had rarely taken care of the children. Silvan also noted that Alcina's job at Alaska Airlines would allow him to visit the children frequently. Alcina responded that he was agreeable to a relocation to Arizona and would try again to transfer there, but maintained that the children should stay with him until Silvan got "situated." The superior court granted Silvan's interim custody and support request but denied her motion to relocate, postponing resolution of the issue until trial. Silvan was allowed to remain in the family home.

At trial Alcina reiterated his position that the children should live with him in Alaska during the school year. He agreed to move to Anchorage and proposed that his father or his niece could come to Alaska to care for the children while he was working nights. Silvan made clear that if she were not granted sole custody of the children, she would remain in Willow rather than move to Arizona without them.

Superior Court Judge Sharon L. Gleason issued an oral decision on July 7, 2003, finding that if Silvan were to relocate to Arizona, the children's best interests would be served by staying in Alaska with Alcina. In the alternative, the superior court found that if Silvan stayed in Alaska, custody should be shared, with the children staying with Silvan four nights a week and with Alcina three nights. The trial court awarded Silvan child support and split the marital property 60/40 in her favor. Because the house was the primary marital asset, the trial court decided that the house should be sold and that Alcina should pay Silvan her sixty percent share of its stipulated value by the end of the year. Alcina was permitted to move back into the home upon giving Silvan thirty days' notice that she was to vacate. Alcina was also ordered to pay Silvan $500 per month, to be deducted from Silvan's share of the home's value, until the house was sold.

Alcina gave notice that he wished to move back into the home, but Silvan refused to leave. While this appeal was pending, the superior court granted a writ of assistance and Silvan vacated the house. Alcina then refinanced the house and paid Silvan sixty percent of the agreed value of the house, satisfying the property division judgment. He now lives in the house. Silvan moved in with friends in Wasilla and, with her mother's help, was able to find an apartment. In November 2003, on Alcina's motion, the supe-

rior court found that Silvan was "voluntarily and unreasonably unemployed." The trial court imputed income to her, which in turn reduced the child support due her from Alcina.

## III. STANDARD OF REVIEW

Trial courts are vested with broad discretion in determining custody issues in divorce actions. A superior court's resolution of custody issues will be disturbed only if we are convinced that the record shows an abuse of discretion under the test of the best interests of the child, or if controlling findings of fact are clearly erroneous.[1] "We will find that a trial court abused its discretion only when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[2] If the superior court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others," we will find an abuse of discretion.[3] Equitable division of property and awards of spousal support in divorce actions are also reviewed for abuse of discretion and will not be overturned unless they are clearly unjust.[4]

## IV. DISCUSSION

### A. Silvan's Notice of Appeal Was Timely.

Alcina asserts that Silvan failed to timely file the appeal of the custody judgment. Under Appellate Rule 218, the notice of appeal in a custody case must be filed within fifteen days of the date of the judgment; in this case that deadline was August 26, 2003. After judgment, Silvan moved for reconsideration on the property issues but not the custody issues. She did not file her notice of appeal until September 11, nine days after the superior court ruled on her motion for reconsideration. Alcina claims that the pending motion for reconsideration on other non-custody issues did not toll the deadline for the custody appeal. Silvan maintains that the appellate clerk's office told her to wait to file the notice of appeal until there was a final judgment on all issues. Silvan also claims that a brief delay should be forgiven, given her uncertainty as to how to interpret the rule in the case of child custody and property division issues. We agree.

Although the fifteen-day rule by its terms applies to "appeals from final judgments for custody of children,"[5] under Appellate Rule 218(c)(1) an appeal can only be bifurcated by court order upon a showing of good cause. Rule 218(c)(1) contemplates a single final judgment which includes both "points related to the custody of children and points which do not relate to the custody of children (for example, property division or spousal support). . . ."[6] To require an immediate appeal on custody issues when property division issues are pending resolution would essentially force bifurcation of the appeal. Absent a court order, Rule 218 requires a final judgment on all issues in cases involving custody prior to filing a notice of appeal. Silvan's notice of appeal was filed less than fifteen days after the motion for reconsideration was denied, making judgment on all issues final and her appeal timely.

### B. The Superior Court Did Not Abuse Its Discretion by Granting the Father Custody if the Mother Relocates to Arizona.

Silvan essentially raises two challenges to the custody decision. First, she

---

1. *Horutz v. Horutz*, 560 P.2d 397, 399 (Alaska 1977).

2. *Buster v. Gale*, 866 P.2d 837, 841 n. 9 (Alaska 1994) (quoting *Dura Corp. v. Harned*, 703 P.2d 396, 409 (Alaska 1985) (internal quotations omitted)).

3. *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 134 (Alaska 1997) (citing *McDanold v. McDanold*, 718 P.2d 467, 468 (Alaska 1986)).

4. *See Laing v. Laing*, 741 P.2d 649, 651 (Alaska 1987); *Davila v. Davila*, 908 P.2d 1027, 1031 (Alaska 1995).

5. Appellate Rule 218(a)(1).

6. Appellate Rule 218(c)(1).

claims that the superior court's decision strayed from the procedure laid out in *Moeller–Prokosch v. Prokosch I & II*.[7] She also challenges the superior court's decision on the merits, claiming that Alcina "is not an appropriate candidate for primary custody of the children." We disagree.

The superior court correctly applied our holdings in *Moeller–Prokosch I & II*. The court assumed that a move would occur and found that Silvan had a legitimate reason to move: "a desire to get away from the State of Alaska"; and it thoroughly examined the factors for determining the best interests of the children as laid out in AS 25.24.150(c). The superior court focused on the factor that considers "the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent,"[8] and found that Alcina was better able to promote the children's open relationship with their mother. The trial court expressed concerns about Silvan's ability to foster an open relationship with Alcina, remarking:

> Ms. Silvan demonstrated to me a difficulty in recognizing the importance of Mr. Alcina's role as the father of these children. She testified that dad has never taken care of the children, not recognizing at least his contribution or caretaking role the last several months. And she testified also, they are with me all the time, which did not, in my mind, give recognition to dad's role now.

The superior court concluded that some of Silvan's actions, while "well-intentioned, had the [e]ffect of impeding an open relationship between father and son." In contrast, the trial court "found Mr. Alcina repeatedly talked about the decisions that he and Ms. Silvan made in the plural. We moved schools, we decided to move . . . whereas Ms. Silvan spoke repeatedly of my child, and my desires." The superior court evaluated this factor in light of Silvan's proposed move. The court was concerned that if Silvan had problems fostering a relationship with the father at the time of trial, "there would be a difficulty on the part of mom to recognize the importance of dad's role if he were several hundred or 1,000 miles away." While the trial court noted that Silvan was willing to accommodate visitation by Alcina, it also found that "airline travel realities would preclude Mr. Alcina from maintaining that level of travel," and that Silvan would view Alcina as "visiting [the children] rather than being active . . . in a parental role."

■ We conclude that the weight that the superior court gave to this factor was appropriate, particularly in light of the impending move. It is essential to have a custodial parent willing to foster an open relationship with the other parent when a great distance separates the children from the non-custodial parent, and it is reasonable for the superior court to place enhanced importance on this factor when making its decision.[9] There is no indication that the trial court relied on this factor to the exclusion of all others.[10]

We are not persuaded by Silvan's argument that the trial court held Silvan's decision to relocate against her when making its findings. Unlike *Moeller–Prokosch III*,[11]

---

7. *Moeller–Prokosch v. Prokosch*, 27 P.3d 314 (Alaska 2001) (*Moeller–Prokosch I*); *Moeller–Prokosch v. Prokosch*, 53 P.3d 152 (Alaska 2002) (*Moeller–Prokosch II*).

8. AS 25.24.150(c)(6).

9. *See, e.g., Dupre v. Dupre*, 857 A.2d 242, 258 (R.I.2004) (stating that past actions of relocating parent, either to foster relationship between child and other parent, or to frustrate the relationship, would be important consideration); *Ireland v. Ireland*, 246 Conn. 413, 717 A.2d 676, 686 (1998) (considering "the relationship between the parents themselves and its potential negative impact, if any, on the child" as a factor with the "potential to shed further light on what the best interests of the child may be in relocation cases"); *see generally* Janet Leach Richards,

*Children's Rights v. Parents' Rights: A Proposed Solution to the Custodial Relocation Conundrum*, 29 N.M. L.Rev 245, 259 (1999); Judith S. Wallerstein & Tony J. Tanke, *To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce*, 30 Fam. L.Q. 305, 311 (1996).

10. *Cf. Smith v. Weekley*, 73 P.3d 1219, 1227 (Alaska 2003) (finding cause for remand when the trial court failed to consider all statutory relevant factors, not just willingness to foster a relationship with the other parent).

11. *Moeller–Prokosch v. Prokosch*, 99 P.3d 531, 535–36 (Alaska 2004) (*Moeller–Prokosch III*) (holding it was error to not consider pertinent consequences of mother's assumed relocation,

there is no evidence to indicate that the superior court did not individually address and consider both parents' situations. The oral findings of the superior court indicate that there was "symmetric consideration of the consequences" to the children, if Silvan were to move with the children or without them.[12]

The trial court concluded "that the needs . . . of the children would best be met by having both parents active in their lives and by having Mr. Alcina have primary custody in the event that . . . Ms. Silvan decided to go through with her decision to relocate." The superior court provided alternative custody arrangements dependent on whether the move occurred—a method authorized by *Moeller–Prokosch I*.[13] The trial court did not disapprove of Silvan's decision to move, expressly finding that Silvan's reason was not illegitimate.

Silvan argues that the trial court's decision violates *Moeller–Prokosch II*, in which we held that "it is impermissible to count [the mother's] move . . . as a negative best-interests factor personal to [the mother] if her reasons for moving are legitimate. . . ."[14] But the trial court in this case did not find that the move itself would impair a good relationship between the children and their father. Instead it found that Silvan's tendency to fail to foster that relationship would be exacerbated by the move. Alcina's better attitude toward the children's relationship with Silvan, by contrast, would allow the bond to be strengthened even across the distance to Arizona if he were given primary custody. The superior court made its decision by comparing the living situations for the children in Arizona and Alaska, not by an impermissible consideration of whether the move itself was in their best interests.

Silvan also argues that the trial court erred by basing its decision on Silvan's new relationship. It is true that the superior court mentioned its "concern about the role of [Silvan's] boyfriend in the litigation." It is also true, as Silvan argues, that a new relationship should not on its own count against a parent.[15] But the trial court explained that its specific concern over the new boyfriend was based on his demeanor and actions during trial and the concern that "his role with . . . [the] divorce could impede mother's ability to allow for an open, loving and frequent relationship" with Alcina. Trial judges are in the best position to make determinations about the demeanor of the parties and how their relationships with each other will impact the child. There is nothing to indicate that the superior court's finding in this instance was unreasonable or clearly erroneous.

By recounting her version of the facts, Silvan also appears to challenge some of the superior court's factual findings. Specifically, she notes that Alcina works four nights a week and that therefore the children would spend that time with a third party, Alcina's father, if Silvan moved away and Alcina were given custody. But this argument was presented to the superior court, which found that the grandfather would be a good guardian while Alcina was at work. And the trial court found that the children were doing well in both homes, and that both parents were "very good parents." When the superior court is faced with conflicting evidence, we do not re-weigh it. "It is the job of the trial court, not the appellate court, to judge the credibility of the witnesses and to weigh conflicting evidence."[16] The superior court's factual findings are supported by the record and are not clearly erroneous.

---

such as detriment to child that would occur if separated from his mother, and to only consider impact on child if he had to move).

**12.** *See id.*

**13.** 27 P.3d at 317 n. 8.

**14.** 53 P.3d at 157.

**15.** *Cf. Long v. Long*, 816 P.2d 145, 151 (Alaska 1991) (affirming trial court's finding that wife's new relationship was potentially detrimental to

children because it was reported by testimony from all persons involved and introduction of guardian ad litem's report, which described effect of parties' new relationships on children).

**16.** *Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211, 1215 (Alaska 1984) (citing *Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980)).

The superior court applied the law correctly; its custody determination was not an abuse of discretion.

## C. The Superior Court's 60/40 Division of Marital Property Was Not an Abuse of Discretion.

 The division of assets upon the dissolution of a marriage is a three-step process. First, the court determines what property is to be distributed.[17] Next, the court determines the value of the property.[18] Finally, the court allocates the property equitably between the parties.[19] The allocation is committed to the broad discretion of the trial court; this court reverses only for an abuse of that discretion.[20] Silvan objects to the superior court's allocation of the marital assets. The superior court divided them sixty percent for Silvan and forty percent for Alcina. Silvan offers two grounds for rejecting the superior court's division: she claims that it does not properly acknowledge that the house, the main marital asset, was purchased with money provided by her mother, and that it takes insufficient account of the difference in earning potential between her and Alcina.

Silvan asserts that the house, the main marital asset, was "purchased with monies furnished by [Silvan's] mother, that these were family monies which had been received by way of inheritance, and that [Silvan] would eventually have received these funds as her own separate property." She challenges the trial court's finding that the purchase money was a gift to the marriage, but does not challenge the characterization of the house as a marital asset. Instead, she argues that the origin of the purchase money should have led the superior court to award her a greater share. She relies on a footnote in this court's decision in Lundquist v. Lundquist, in which we noted that marital property purchased with separate funds "may be divided in a manner different from the other

marital property of the parties in recognition of the contribution of one of the parties."[21]

We note first that our decision in Lundquist does not require the source of the funds to be given any particular weight in the division. More importantly, though, the superior court explicitly stated that it did consider that Silvan's mother was the source of the funds for the house when doing the 60/40 division. Silvan's argument must therefore be that the superior court should have given it more weight.

Silvan also argues that her low earning potential and her need for further education and rehabilitation entitled her to more than sixty percent of the marital assets. The superior court found that Silvan "has a Bachelor of Arts Degree, bilingual skills—in the short term her earning capacity will be less, however, over time her income may very well surpass [Alcina's]." Silvan provides no evidence or argument to suggest that this finding is clearly erroneous.

The superior court has broad discretion to make an equitable division of property; this court will overturn a division only if it is clearly unjust.[22] Silvan has made no argument suggesting that the 60/40 division in her favor is clearly unjust. We therefore affirm the superior court's division of marital property.

## D. The Superior Court Did Not Err by Denying the Mother the Right To Live in the House Until It Was Sold.

██ The superior court found that the property division could not be accomplished equitably without selling the house. Silvan was living in the house at the time, but the superior court gave Alcina the right to require her to leave on thirty days' notice. Silvan did not leave when requested. The superior court granted a writ of assistance and Silvan vacated the house. Alcina then refinanced the loan and paid Silvan sixty

---

17. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983). Characterizing the property as marital or separate is part of this step.

18. *Id.*

19. *Id.*

20. *Id.*

21. 923 P.2d 42, 48 n. 5 (Alaska 1996).

22. *Wanberg*, 664 P.2d at 570.

percent of the agreed value of the house, satisfying the property division judgment. He now lives in the house.

Silvan does not challenge the trial court's finding that the distribution of assets required selling the home. Instead, she argues that she should have been allowed to remain in the house until the sale and given an opportunity to buy Alcina's interest in it because she was the primary custodial parent. When the trial court divides property, AS 25.24.160(a)(4)(F) instructs it to consider "the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children."[23] But as Alcina argues, the superior court awarded the parents "shared physical custody" of the children, and Silvan does not have primary physical custody. The superior court's division of custody into three days with Alcina and four days with Silvan is close to an even split. Because there is not such a significant difference in their custodial times that Silvan should be considered to be the primary custodian, AS 25.24.160(a)(4)(F) does not apply.

 Silvan also argues that the superior court erred in failing to consider allowing Silvan to live in the home "for a reasonable period of time." Silvan relies on *Hanlon v. Hanlon* in support of this argument.[24] In *Hanlon*, we affirmed the superior court's finding that the mother and primary physical guardian should not be awarded the house but remanded because the superior court never considered the mother's request to be allowed to live in the home for two years or until her daughter finished high school.[25] Although Silvan requested to remain in the house, she never requested to be allowed to stay in the house for a more limited fixed period. We therefore conclude that she has failed to preserve this issue for appeal.[26]

Silvan also claims that the trial court erred in not "giving [her] an opportunity to purchase [Alcina's] interest." But we have concluded that the 60/40 division is equitable, and the trial court has wide discretion in deciding how to structure the property division. We cannot say that the superior court abused its discretion on this point.

Silvan cursorily argues that she should not have to pay the attorney's fees Alcina incurred in securing her departure from the house. Given that she remained in the home in defiance of a court order, we can see little basis to support Silvan's appeal of attorney's fees, and we conclude that the trial court did not abuse its discretion in its award of fees.

Finally, Silvan argues in her reply brief that the costs of sale should not have been deducted from her part of the property division because Alcina never sold the house. This argument does not appear to have been addressed to the trial court and thus is not properly before us at this time.

**E. The Superior Court's Award of Interim Support Was Not an Abuse of Discretion.**

 Silvan finally challenges the superior court's failure to award rehabilitation or reorientation support. Reorientation support "is essentially transitional and may be awarded for brief periods to provide support pending the sale of marital property or to enable a spouse to get a job appropriate to the spouse's existing skills."[27] Rehabilitation support "is properly limited to job training or other means directly related to the end of securing for one party a source of earned income."[28]

The superior court ordered Alcina to pay Silvan $500 per month until the house was sold, to be taken out of her share of the property division. Silvan claims that this was inadequate and that the trial court

**23.** AS 25.24.160(a)(4)(F).

**24.** 871 P.2d 229 (Alaska 1994).

**25.** *Id.* at 234.

**26.** *See Vivian P. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 78 P.3d 703, 709 (Alaska 2003) ("We will not address an issue on appeal that was not raised at trial.").

**27.** *Davila v. Davila*, 908 P.2d 1025, 1027 (Alaska 1995) (internal quotation marks omitted).

**28.** *Schanck v. Schanck*, 717 P.2d 1, 5 (Alaska 1986).

"should at least have provided sufficient transitional money in addition to the property division award to allow [Silvan] to find a place of her own and have transportation" until the award was paid. This court reviews the decision not to award spousal maintenance for abuse of discretion.[29]

Silvan provides little argument for her position that the award of $500 per month was insufficient, merely asserting that it was "astonishing in its harshness," and that she was "treated with a complete lack of dignity and respect both by her husband and by the court." She makes no specific showing, beyond her bare assertions, that this award was inadequate in her case. While there may be merit in Silvan's argument that the award was inadequate for Silvan to find housing and transportation, she points to no trial testimony concerning those expenses to suggest that the award was an abuse of discretion. By contrast, in *Davila v. Davila*, the appellant spouse presented a detailed budget showing the cost of her plan for education and employment.[30] Silvan offers no comparable argument or evidence suggesting that the superior court abused its discretion. She has not pointed to evidence concerning housing and transportation costs or expenses related to her maintenance and re-entry into the job market. Because of Silvan's utter failure of proof on this issue, we cannot conclude that the trial court abused its discretion.

Silvan also appears to question the superior court's finding that she was voluntarily and unreasonably unemployed. Silvan notes that "she had been out of the job market for ten years, had no home or transportation, and still had the duty of caring for the children four days and nights a week." While the trial court recognized her limited experience, it also recognized that she had a college degree and bilingual abilities that would enable her to surpass Alcina's income, as noted above. Moreover, it found that it would be reasonable for her to work part-time on the days Alcina had the children and to seek employment in Anchorage, rather than looking solely in Wasilla. Silvan has not demonstrated that the superior court's findings in this regard are clearly erroneous.

## V. CONCLUSION

Because the superior court properly applied all of the necessary factors in determining custody, and because the court's property division and interim support awards are not clearly erroneous, the superior court's decision is AFFIRMED in its entirety.

---

29. *Davila v. Davila*, 908 P.2d 1027, 1031 (Alaska 1995).

30. *Id.* at 1033–35. In *Davila*, we still affirmed the award, concluding that the mother's assigned property provided sufficient assets to cover the cost of her education and employment.