**IN THE COURT OF APPEALS OF IOWA**

No. 17-1252
Filed November 7, 2018


**IN RE THE MARRIAGE OF LINE NANG BACCAM
AND KHAMPHA ONMANIVONG**

**Upon the Petition of
LINE NANG BACCAM,**
        Petitioner-Appellee,

**And Concerning
KHAMPHA ONMANIVONG,**
        Respondent-Appellant.
_____


        Appeal from the Iowa District Court for Polk County, David M. Porter

(existence of common law marriage) and Lawrence P. McLellan (dissolution

decree), Judges.


        Khampha Onmanivong appeals the decree dissolving his common law

marriage to Line Nang Baccam.  **AFFIRMED AS MODIFIED.**


        Eric R. Eshelman, Des Moines, for appellant.

        Katherine S. Sargent, Des Moines, for appellee.


        Considered by Mullins, P.J., McDonald, J., and Carr, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**CARR, Senior Judge.**

Khampha Onmanivong appeals the decree dissolving his common law marriage to Line Nang Baccam. He first challenges the finding that a common law marriage existed. He also challenges the provisions of the decree relating to spousal support, property division, child support, and attorney fees.

**I. Background Facts and Proceedings.**

Line and Khampha met in February 1990. At the time, Line was twenty years old and Khampha was twenty-eight. The two began dating shortly thereafter. Line moved into the home Khampha owned in 2003. Their first child was born in 2004, followed by the birth of a second child in 2006.

There is a dispute as to whether the couple married. Although they never obtained a marriage license, they did take part in a religious ceremony in front of family and friends on October 2, 2004. The invitation for the ceremony described it as a "Tai Dam wedding engagement." Line claims it was a wedding ceremony and that the language used on the invitation was due to a translation mistake she made. Khampha claims it was only an engagement ceremony.

On April 9, 2009, Khampha and Line signed a certification and declaration of common law marriage in front of a notary public. The document allowed Khampha to add Line to the family health insurance plan offered by his employer. It states:

> We, the undersigned, being husband and wife under the laws of the State of Iowa, do severally and jointly certify, declare, and acknowledge, to and for the benefit of Bridgestone America Holding, Inc., that we:
> 1. each have a present intention to be husband and wife;
> 2. each intended to be husband and wife at the time our common law marriage was established;

3. each had the capacity to enter into the marriage contract;
4. on or about 3-30-02 have cohabited and continue to cohabit as husband and wife;
5. have publicly declared that we are husband and wife;
6. believe we are reputed to be husband and wife in the community where we reside.

In May 2015, Line petitioned to dissolve the marriage. In his answer, Khampha denied the parties were ever married. The district court held a bifurcated trial in order to determine the existence of a common law marriage separately from the dissolution issues. Following the first phase of trial, the district court determined the parties were married on October 2, 2004. Khampha appealed from that ruling, but our supreme court deemed the ruling interlocutory and denied his appeal.

The district court continued to the second phase of trial to determine issues related to property, support, and child custody. It entered a decree dissolving the marriage and dividing the parties' property and debts. Pursuant to the parties' agreement, the court granted Line physical care of the children. It also granted the parties joint legal custody of the children. The court ordered Khampha to pay Line $1002.87 per month in child support, $1000.00 per month in spousal support, and $8000.00 in attorney fees.

On appeal, Khampha challenges both the finding that the parties were married as well as the provisions of the decree dissolving their marriage.

**II. Discussion.**

**A. Existence of a common law marriage.**

We review the determination of a common law marriage de novo. *See In re Marriage of Martin*, 681 N.W.2d 612, 617 (Iowa 2004). Because public policy

does not favor common law marriages, we carefully scrutinize claims of their existence. *See id.* The burden of proof rests with the party asserting the existence of a common law marriage. *See id.*

Three elements must be satisfied before the court will find a common law marriage exists. *See id.* First, both parties must have had a present intent and agreement to be married. *See id.* With regard to this requirement,

> an express agreement is not required. An implied agreement may support a common law marriage where one party intends present marriage and the conduct of the other party reflects the same intent. The conduct of the parties and their general community reputation is evidence that can be used to support a present intent and agreement.

*Id.* (citations omitted). Second, the parties must have engaged in continuous cohabitation. *See id.* Finally, there must have been a public declaration that the parties are married. *See id.*

> The public declaration or holding out to the public is considered to be the acid test of a common law marriage. This means there can be no secret common law marriage. Yet, it does not mean that all public declarations must be entirely consistent with marriage. A substantial holding out to the public in general is sufficient.

*Id.* (citations omitted).

Khampha does not dispute that he and Line cohabited but argues there is insufficient evidence to show a present intent and agreement to be married or a public declaration of marriage. He disputes that the October 2, 2004 ceremony was a wedding ceremony, citing the testimony of four witnesses who attended the ceremony and did not believe he and Line were married. We note that those witnesses are related to Khampha by birth or marriage. Their testimony is in

conflict with that of two former coworkers of Line, both of whom attended the ceremony and testified that it was a marriage ceremony.

The most persuasive evidence concerning the existence of a common law marriage is the notarized certification and declaration of common law marriage that both parties signed. Khampha now claims that he did not understand the nature of the document he was signing and did so only to allow him to obtain paid leave from work to attend a funeral for Line's grandmother. He testified that Line directed him to sign the document and that he would not have done so if he knew what it alleged. However, Khampha also testified that he understood that his health insurance policy would not have covered Line if they were unmarried and signed the document to obtain insurance coverage for her:

> Q. So the affidavit was to prove that [Line] was your wife so you could add her to insurance? A. Yeah, it was because if I didn't do that, then she wouldn't have insurance.

The acts of signing the document and adding Line to his health insurance policy demonstrate both the elements of mutual agreement and public declaration. *See In re Estate of Fisher*, 176 N.W.2d 801, 806-07 (Iowa 1970) (finding parties' representations of marriage in the process of securing a life insurance policy indicated the parties' mutual agreement to be married and a public acknowledgment of the marital relationship); *In re Estate of Stodola*, 519 N.W.2d 97, 100 (Iowa Ct. App. 1994) (finding a notarized declaration of common law marriage signed by both parties and filed with one party's health insurance carrier to obtain benefits to be the most persuasive evidence of a common law marriage). Coupled with the evidence concerning the October 2, 2004 ceremony and

evidence that others in the community viewed Line as Khampha's wife,[1] we agree that Line has met her burden of proving the existence of a common law marriage.

Khampha also argues that common law marriage should be abolished in Iowa because the reasons for its recognition no longer exist in modern society. Our supreme court has recognized common law marriage "for well over a century." *Fisher*, 176 N.W.2d at 804. "We are not at liberty to overrule controlling supreme court precedent." *State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014). We therefore decline to entertain his argument on this issue.

**B. Spousal support.**

Khampha challenges the district court's award of spousal support to Line in the amount of $1000.00 per month until Khampha reaches the age of sixty-seven or remarries. Although the court stated it was "not labeling this support with any of the categories enumerated in previous decisions by our appellate courts,"[2] Khampha characterizes the award as traditional spousal support and argues their marriage was of insufficient duration to justify such an award.[3]

---

[1] Although Khampha purports to have corrected those who referred to Line as his wife, this fact is not determinative. *See Stodola*, 519 N.W.2d at 100 (concluding evidence established a common law marriage even though "there was also undisputed evidence of a number of instances during the twenty-year period when [the parties] represented they were single people or not married").

[2] The district court noted that recent appellate opinions have enumerated that such distinctions are unnecessary, citing *In re Marriage of Becker*, 756 N.W.2d 822, 827 (Iowa 2008) (stating it could not characterize a spousal-support award as strictly rehabilitative or traditional and noting it may be a combination of both), and *In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015) (characterizing the moniker assigned to awards of spousal support as a "red herring" because the categories of spousal support "are not mutually exclusive").

[3] Although the district court determined the marriage began on October 2, 2004, Khampha argues that the parties were married only seven years based on the date they signed the certification of common law marriage. We accept the October 2, 2004 date as the date the parties married.

In determining whether to award spousal support, the court considers the factors set out in Iowa Code section 598.21A(1) (2015). Because we accord the trial court considerable latitude in determining matters of spousal support, we will disturb such an award only when there has been a failure to do equity. *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015).

Our supreme court has observed that, typically, traditional spousal support is awarded in cases involving long-term marriages, noting that "marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support." *Id.* at 410-11. Although marriages of shorter duration are less likely to result in an award of traditional spousal support, there is no "fixed formula" for determining whether to award traditional spousal support. *Id.* at 410. However, as our supreme court has repeatedly noted, precedent is of little value because the court must determine an award of spousal support on the particular circumstances of each case. *See, e.g.*, *id.* at 408.

One of the factors cited by the district court cited in determining Line should receive spousal support is the disparity in the parties' incomes. From 2012 to 2016, Khampha earned between $53,455.00 and $59,894.00 per year. In contrast, the district court determined that Line was capable of earning between $22,000.00 and $23,000.00 per year in a clerical position based on her clerical employment at Citibank from 1997 until the company downsized in 2010. After Line left Citibank, she began working as a care provider for her father, earning between $14,655.00 and $14,955.00 per year from 2014 through 2016. Although Khampha focuses on Line's decision to care for her father rather than returning to a job in financial services where she could earn a greater salary, Line testified that her reasons for

assuming care of her father were twofold. First, she cited that another care provider would have difficulty communicating with her father, for whom Line has to act as an interpreter during doctor appointments and other tasks. Second, she testified that her position as a care provider is part-time and provides her with flexible working hours, which allows Line to attend to her children's needs outside of school. The second factor becomes especially significant given the needs of the younger child, who has a diagnosis of selective mutism and whose anxiety is so great that it caused her to vomit on almost a daily basis while in preschool.[4] As reported by the child's therapist, the child "has anxiety related to using words outside of specific family members, eating and using the bathroom at school." Although Khampha's attorney attempted to dismiss Line's concerns about caring for her children while working a fulltime job as those of any divorced parent,[5] it is

---

[4] The child, who was ten years old at the time of trial, would have been approximately three years old when Line left her position at Citibank, which would be around the time in which the seriousness of the child's anxiety became evident.

[5] The following is a selected portion of Line's cross-examination testimony:

Q. The point of the matter is that the girls are getting older. When do you think that you would feel comfortable with them being home for two hours or two and a half hours on their own without having to have a baby-sitter there? A. Right now I'm not for sure. I just don't want to leave them for more than an hour. My dilemma is with [the younger child], having her issues with the selective mutism, it would be hard.

Q. Okay. My question was, at what age in your mind do you see yourself being comfortable enough to let them stay at home for a couple hours by themselves until you could get home from work? A. I just have to work with them right now. They've been home, like, an hour at the most, and they do fine, but a long period of time, I'm not for sure about that, if anything should arise.

. . . .

Q. Ma'am, again, don't you think that there's a lot of families out there that have the same issues you're raising here that take care of that? . . . Wouldn't you agree with [that]? A. Yes, they do, but they make arrangement—Arrangements take money. I have to pay for day-care provider or whoever. And I don't have those resources right now.

Q. Ma'am, you would have those resources if you got a full-time job and you got back to the earning capacity that you had when you left and

evident from the record that the resources available to other divorced parents with regard to transportation and childcare are not an option here given the younger child's needs.

The decision to award traditional spousal support primarily depends on the need of the spouse receiving the support balanced against the ability of the supporting spouse to pay. *See In re Marriage of Stenzel*, 908 N.W.2d 524, 533 (Iowa 2018). Line's affidavit of financial status indicates her need to be $2740.00 per month. Her net monthly income is $1284.00, and she will receive an additional $1003.00 per month in child support, which provides her with total resources of $2287.00 per month—a shortfall of $453.00. Khampha's affidavit of financial status shows monthly expenses of $3367.00. Taking into consideration expenses for housing that he will no longer incur post-decree, Khampha's monthly expenses amount to $1706.00.[6] His net monthly income is $3236.00. Subtracting his monthly expenses and his child support obligation of $1003.00 from that amount, Khampha has $527.00 from which to pay spousal support.

---

separated from Citibank in 2010? A. I would, but . . . I would have to think about my kids.

. . . .

Q. So, Line, your excuse forever, as I understand it, is going to be, I'm not going to get a full-time job, I'm not going to upgrade my skills because I don't want to leave my daughters home by themselves for any period of time and I have to take care of my father. That's basically what I'm hearing you tell me. Am I correct? A. No.

Q. How am I incorrect on that? A. I've been seeking job. I've been doing resources. I've been looking around, asking people, friends and family, you know, looking for employment. But the hours just [don't] work for me.

[6] Khampha's affidavit of financial status included child support in his monthly expenses. We removed this amount from the calculation.

The record shows Line has a need for spousal support and Khampha has the ability to pay it. However, the amount ordered by the district court—$1000.00 per month—leaves Khampha with a shortfall of $473.00 per month and Line with a surplus of $547.00 per month. This is inequitable. We find an equitable award of spousal support to be $460.00 per month

In sum, the facts of this case warrant an award of traditional spousal support even though the length of the marriage does not cross the "durational threshold" for such awards. The award of traditional spousal support is warranted by Line's need to be available to care for the children, especially the younger child, which reduces Line's ability to reach her actual earning capacity as the district court determined based on her prior earnings at Citibank. The spousal-support award could be the subject of a later modification action if the child's needs abate or the child reaches the age of eighteen and no longer needs any special care from Line. As discussed above, we reduce the amount of the spousal support award to $460.00 per month.

### C. Property division.

Khampha next challenges the division of property, arguing it is inequitable. In reviewing his claim, we are mindful of the following principles:

> Iowa is an equitable division state. An equitable division does not necessarily mean an equal division of each asset. Rather, the issue is what is equitable under the circumstances. The partners in the marriage are entitled to a just and equitable share of the property accumulated through their joint efforts. Iowa courts do not require an equal division or percentage distribution. The determining factor is what is fair and equitable in each circumstance. The distribution of the property should be made in consideration of the criteria codified in Iowa Code section 598.21(5) . . . . While an equal division of assets accumulated during the marriage is frequently considered fair, it is not demanded.

*In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009) (citations omitted).

In dividing the marital property, the district court awarded the marital home to Line. It offset $17,332.84 of the home's equity to Khampa as credit for his down payment on the home. The court awarded each party a vehicle, assessed two credit card debts to Line, and offset part of the parties' 2015 tax return to Line. With regard to the proceeds of a CD and bank account, which were placed in a trust account valued at $115,700.64, the court awarded $86,987.82 of the account to Khampha and $28,712.82 to Line. The result was a nearly identical division of the parties' property; Khampha received assets valued at $94,814.98 and Line received assets valued at $94,814.12. The court also awarded Line one-half of the marital portion of Khampha's noncontributory pension plan. *See In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996) (noting that pensions are marital assets subject to division and setting forth the formula for dividing pension benefits accrued during the marriage).

Khampha argues it is inequitable to award Line $28,712.82 in addition to the marital home and one-half of the marital portion of his pension. We disagree. Although the court awarded Line the marital home, Khampha received a greater portion of the cash assets. The court awarded the parties assets that are nearly equal in value. Our supreme court has recognized that generally, an equal division of assets is often most equitable. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007). The division of property here is equitable under the facts before us.

**D.  Child support.**

Khampha challenges the portion of the decree ordering him to pay Line $1000.00 per month in child support.  He argues the district court erred in determining the amount of child support by using Line's income rather than her earning capacity.

In applying the child support guidelines, the court may consider earning capacity rather than actual earnings of those parents who voluntarily reduce their income or decide not to work.  *See In re Marriage of Nelson*, 570 N.W.2d 103, 106 (Iowa 1997).  Before doing so, the court must make a determination that using the parent's actual earnings would result in a substantial injustice or that an adjustment is necessary to provide for the child's needs and to do justice between the parties.  *See id.*  Those facts are not present here, where the record shows that Line is unable to work fulltime based on the needs of the children.

**E.  Attorney Fees.**

Finally, Khampha argues the district court erred in awarding Line $8000.00 in attorney fees.  We review an award of attorney fees for an abuse of discretion.  *See Benson*, 545 N.W.2d at 258.  "Trial courts have considerable discretion in awarding attorney fees.  Whether attorney fees should be awarded depends on the respective abilities of the parties to pay.  In addition, the fees must be fair and reasonable."  *In re Marriage of Witten*, 672 N.W.2d 768, 784 (Iowa 2003) (citation omitted).

The parties received roughly equal shares of the marital property.  Although there is a disparity in their earnings, the awards of spousal and child support leave the parties with roughly equal financial resources each month after expenses.

Because the parties have the same ability to pay attorney fees, the trial court abused its discretion in ordering Khampha to pay $8000.00 in Line's trial attorney fees, and we modify the decree to eliminate the award of trial attorney fees.

**AFFIRMED AS MODIFIED.**

Mullins, P.J., concurs; McDonald, J., dissents.

**McDONALD, Judge** (dissenting)

I concur in the majority's resolution of the issues with the exception of spousal support. On that issue, I respectfully dissent. The facts and circumstances of this case do not support an award of spousal support.

Alimony originated in English ecclesiastical courts as an obligation of the husband to provide continued support for his wife upon separation. The courts created alimony at a time when absolute divorce was not available or at least not readily available:

> Prior to the English reforms of 1857, the rationale for alimony was simple enough: upon marriage a husband undertook a lifetime obligation to support his wife. Although he could obtain a legal separation from her (divorce a mensa et thoro), rarely could he fully sever marital ties (divorce a vinculo). Accordingly, a husband's duty of support continued throughout his wife's life, whether or not they lived together. Alimony was the mechanism, designed by the English ecclesiastical courts, for enforcing the husband's lifetime obligation to support and sustain his wife. Indeed, the word "alimony" derives from the Latin "alimonia," which means sustenance.

> Underpinning the husband's support obligation was an assumption that married women should not be expected to support themselves. Employment opportunities for women were limited, and a married woman's property was subject to her husband's control. Indeed, at common law a married woman's identity merged into that of her husband, who bore a moral and legal obligation to provide for her. As Blackstone observed, "[T]he very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and cover, she performs everything . . . ."

Cynthia Lee Starnes, *One More Time: Alimony, Intuition, and the Remarriage-Termination Rule*, 81 Ind. L.J. 971, 983 (2006) (citations omitted) (hereinafter *Starnes*); *accord Jolly v. Jolly*, 1 Iowa 9, 11 (Iowa 1855) ("It is the nourishment—the maintenance—the allowance made for the support of the wife, which is given and fixed by the proper court out of the husband's estate, when they are legally

separated."); Robert K. Collins, *The Theory of Marital Residuals: Applying an Income Adjustment Calculus to the Enigma of Alimony*, 24 Harv. Women's L.J. 23, 39–48 (2001) (hereinafter *Collins*) (summarizing history of alimony);Chester G. Vernier & John B. Hurlbut*, The Historical Background of Alimony Law and Its Present Statutory Structure*, 6 Law & Contemp. Probs. 197, 197–98 (1939) (hereinafter *Vernier & Hurlbut*) (summarizing history of alimony).

Iowa has long recognized the availability of spousal support as a form of relief in a dissolution action.  Our territorial statutes provided "the court shall make such order and decree touching . . . the alimony and maintenance of the wife . . . as from the nature of the case and circumstances of the parties may appear to the court equitable and just."  Iowa Rev. St. 1843 (Terr.), Ch. 65, Sec. 5.  The 1851 Iowa Code provided that "[w]hen a divorce is decreed the court may make such order in relation to the . . . property of the parties and the maintenance of the wife as shall be right and proper."  Iowa Code § 1485 (1851).  This provision of the code remained unchanged until 1977, when the General Assembly amended the statute to provide the court may enter an order for "the maintenance of the parties as shall be justified."  H.F. 287, 67th Gen. Assemb.,1st sess. (Iowa 1977).  The statute was amended several times since.  At present, the code provides, "Upon every judgment of annulment, dissolution, or separate maintenance, the court may grant an order requiring support payments to either party for a limited or indefinite length of time . . . ."  Iowa Code § 598.21A(1) (2015).  The code then provides a list of factors for the court to consider in making such an award.  Iowa Code § 598.21A(1)(a–j).

While Iowa law has long-recognized the availability of spousal support upon dissolution of the marriage, the justification for the provision of spousal support outside the historical practice has not been well-developed. *See* Starnes, at 984 ("These visions of limited divorce and lifetime support obligations, of course, do not satisfactorily explain alimony after the advent of absolute divorce."). Our early cases recognized the husband had an obligation to prevent his former spouse from becoming a public charge. *See Dupont v. Dupont*, 10 Iowa 112, 115 (Iowa 1859) ("The defendant is in good circumstances, and though the parties lived together as husband and wife but fourteen months, though she brought to him no fortune at the time of the marriage, and has in no essential respect assisted in accumulating the estate of the defendant, she is, under the circumstances, entitled to his assistance in relieving her necessities, and in preventing her from becoming an object of charity in her old age."). Our early cases also recognized fault as a relevant consideration in awarding spousal support. *See id.* at 114–15 ("The defendant has, however, forfeited the vantage ground on which he stood on the desertion of him by his wife, by his open and notorious adultery with another woman; and has thus given to the wife a strong claim for alimony out of his estate."). Fault was also a relevant consideration in denying spousal support. *See Fivecoat v. Fivecoat*, 32 Iowa 198, 199 (1871) (holding wife's extramarital affair was sufficient grounds to deny alimony). The advent of no-fault divorce did not clarify the theoretical foundations, if any, underlying spousal support. *See* Ira M. Ellman, *The Theory of Alimony*, 77 Calif. L. Rev. 1, 8–9 (1989) (hereinafter *Ellman*) ("This effect of the no-fault reform apparently was not appreciated at the time the laws were changed, but today some writers maintain that the no-fault reforms have

been a disaster for women because they allow men easy exit from marriage without provision for ensuring a sufficient financial obligation to their former wives. In response, reform efforts have now focused on the law of alimony and property division rather than on the grounds for divorce. Yet there is still no general understanding of why we have alimony at all.").

The lack of a theoretical justification for spousal support upon absolute divorce is not unique to Iowa. While spousal support is ubiquitous in American law, there is no generally recognized justification for the award of spousal support. As the American Law Institute has noted:

> Shifting conceptions of alimony's purpose underlie its recharacterization in recent years as "maintenance" or "spousal support." No single model has proven satisfactory, however, and alimony remains a residual category, functionally defined as those financial awards available in connection with the dissolution of a marriage that are not child support or the division of property.

Principles of the Law of Family Dissolution: Analysis and Recommendations § 5.01 cmt. a (Am. Law Inst. 2002). Another commentator explained:

> American cases elaborate upon the statutory rules, but actual alimony awards as well as their rationales vary from jurisdiction to jurisdiction and from case to case. Even the definition of 'need'—the most fundamental issue created by such statutes—is hopelessly confused. Is the wife 'in need' only when she is unable to support herself at a subsistence level? A moderate middle class level? The level to which she was accustomed in the marriage, no matter how high? The courts have used all of these approaches. Without an articulated theory, we cannot argue that any of these definitions is correct. In short, no one can explain convincingly who should be eligible to receive alimony, even though it remains in almost every jurisdiction.

*Ellman*, at 4–5.

As there is no consensus justification for the provision of spousal support, numerous theories abound. For its part, the American Law Institute has adopted

a loss-based approach to spousal support. *See* Principles of the Law of Family Dissolution: Analysis and Recommendations § 5.02 cmt. a (Am. Law Inst. 2002) ("The principal conceptual innovation of this Chapter is therefore to recharacterize the remedy it provides as *compensation for loss* rather than *relief of need*."). Other justifications include contract, partnership, restitution, fault, protection of the public fisc, and needs-based analysis, among a host of others. *See Collins*, at 39–48 (summarizing justifications); *Ellman*, at 13–40 (summarizing justifications). Ultimately, "[w]hile various theories have since been articulated to explain continuation of the practice, alimony in cases of absolute divorce seems to have survived through inadvertence rather than by deliberation." *Collins*, at 28.

In the absence of grand theory, our courts have nonetheless, case-by-case, developed workable constructs to guide the provision of spousal support. *See* Oliver Wendell Holmes, Jr., The Common Law 1–2 (Dover Publications, Inc. 1991) (1881) ("The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed."). Our cases have come to recognize three primary forms of spousal support: traditional, rehabilitative, and reimbursement. *See In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015); *In re Marriage of Nelson*, No. 15–0492, 2016 WL 3269573, at *3 (Iowa Ct. App. June 15, 2016). None of these forms of spousal support are applicable here.

Traditional spousal support is inapplicable here. Traditional spousal support allows the recipient spouse to continue to live the lifestyle to which he or

she had become accustomed over a lengthy period of time. *See Gust,* 858 N.W.2d. at *412.* Generally, only "marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support." *Id.* at 410–11. This case did not involve a lengthy marriage—the majority determined that the parties were married for only thirteen years. In the absence of a lengthy marriage crossing the durational threshold, an award of traditional spousal support is inappropriate. *See In re Marriage of Stephens*, No. 13–0861, 2014 WL 69728, at *7 (Iowa Ct. App. Jan. 9, 2014); *In re Marriage of Gonzalez*, 561 N.W.2d 94, 99 (Iowa Ct. App. 1997). The majority misapplies controlling doctrine to conclude a marriage of thirteen years can justify an award of traditional spousal support.

Rehabilitative support is also inapplicable here. "Rehabilitative spousal support is 'a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting.'" *In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008) (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 63 (Iowa 1989)). In this case, Line does not seek further training or education. Line has chosen to be a fulltime caretaker for her father instead of resuming her career in finance. While it is Line's right to forego more gainful employment to care for her father, her exercise of this right does not create an obligation for Khampa to continue to subsidize Line's choice. Rehabilitative support is inappropriate in this case.

Nor is reimbursement spousal support appropriate under the circumstances of this case. "Reimbursement spousal support allows the spouse receiving the

support to share in the other spouse's future earnings in exchange for the receiving spouse's contributions to the source of that income." *Id.* A typical scenario in which the court may grant reimbursement support is when the dissolution occurs shortly after one spouse has obtained a professional degree and license with the financial support of the other. *See In re Mueller*, No. 01-1742, 2002 WL 31425414, at *3 (Iowa Ct. App. Oct. 30, 2002). Kampha did not pursue post-secondary education during his marriage to Line. There is no evidence Line made sacrifices in order to allow Kampha to further his career. In fact, Kampha continued to support his family through his job at Firestone when Line took a substantial pay cut and began to care for her father in 2010. Reimbursement spousal support is inapplicable here.

Our case law has recognized an additional form of spousal support— transitional spousal support. Our case law has been somewhat inconsistent in discussing transitional spousal support. At least some of our cases recognize transitional support as a distinct fourth category of spousal support. *See, e.g.*, *In re Marriage of Lange*, No. 16-1484, 2017 WL 6033733, at *3 (Iowa Ct. App. Dec. 6, 2017) ("Jessica does not need traditional rehabilitative support so much as transitional support while finding suitable employment."); *cf. In re Marriage of Lee*, No. 10–0948, 2011 WL 227573, at *6–7 (Iowa Ct. App. Jan. 20, 2011) (affirming two-year spousal support where wife had same education level as husband and strong employment history). The majority of cases, however, treat transitional support and rehabilitative support as interchangeable or treat transitional support as a subset of rehabilitative support. *See, e.g.*, *In re Marriage of Smith*, 573 N.W.2d 924, 926–27 (Iowa 1998) (recognizing transitional support but equating it

to rehabilitative support); *In re Marriage of Diekema*, No. 14-0532, 2015 WL 2393449, at *3 (Iowa Ct. App. May 20, 2015) ("The terms 'transitional' and 'rehabilitative' have been used interchangeably."); *In re Marriage of Hinshaw*, No. 12-1783, 2013 WL 3273584, at *4 (Iowa Ct. App. June 26, 2013) (stating the terms are interchangeable); *In re Marriage of David*, No. 06-0239, 2006 WL 3613805, at *4 (Iowa Ct. App. Dec. 13, 2006) (treating rehabilitative and transitional alimony as the same); *In re Marriage of Suchomel*, No. 06-0309, 2006 WL 3436534, at *2 (Iowa Ct. App. Nov. 30, 2006) ("Rehabilitative or transitional alimony 'serves to support an economically dependent spouse through a limited period of education and retraining.' Its objective is self-sufficiency." (citations omitted)); *In re Marriage of Singer*, No. 02-1770, 2003 WL 22807034, at *2 (Iowa Ct. App. Nov. 26, 2003) ("Transitional alimony, also known as rehabilitative alimony, is designed to assist an economically dependent spouse in becoming self-supporting."); *In re Marriage of Harvey*, No. 99-1558, 2000 WL 1158017, at *2 (Iowa Ct. App. Aug. 16, 2000) ("Transitional or rehabilitative alimony may be awarded to allow a spouse a better chance to become secure in the job market.").

In my view, transitional spousal support is separate and distinct from rehabilitative spousal support. *See, e.g.*, *Silvan v. Alcina*, 105 P.3d 117, 124 (Alaska 2005) (noting "[r]eorientation support 'is essentially transitional and may be awarded for brief periods'" as compared to rehabilitation support (quoting Davila v. Davila, 908 P.2d 1025, 1027 (Alaska 1995))); *Zaleski v. Zaleski*, 13 N.E.3d 967, 969–70 (Mass. 2014) (recognizing four separate statutory categories of alimony, including rehabilitative and transitional alimony); *Ingram v. Ingram*, No. W2017-00640-COA-R3-CV, 2018 WL 2749633, at *6 (Tenn. Ct. App., June 7, 2018)

("Tennessee recognizes four separate types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony."). The two forms of support serve different purposes. Rehabilitative support is intended to support the recipient "spouse through a limited period of re-education or retraining" to allow "that spouse to become self-supporting." *See In re Marriage of Becker*, 756 N.W.2d at 826 (citing *In re Marriage of Francis*, 442 N.W.2d at 63). The critical consideration is the expectation the recipient spouse will have lower earnings for a limited time while investing in his or her human capital to increase future earnings. *See In re Marriage of Hulett*, No. 00-1312, 2001 WL 1658840, at *3 (Iowa Ct. App. Dec. 28, 2001) ("The key fact warranting an award is that Lois requires assistance in the short-term to become self-sustaining in the long-term."). In contrast, transitional support applies where the recipient spouse may already have the capacity for self-support at the time of dissolution but needs short-term assistance in transitioning from married status to single status due to the economic dislocation caused by the dissolution of marriage. The critical consideration is whether the recipient party has sufficient income and/or liquid assets to transition from married life to single life without undue hardship. *See, e.g.*, *In re Marriage of Hinshaw*, 2013 WL 3273584, at *4 (affirming transitional alimony award where spouse testified support "would help her 'get back on [her] feet' as far as establishing a residence for herself and the children" (alteration in original) (citation omitted)); *In re Marriage of Byrne*, No. 03-0788, 2003 WL 23220082, at *3 (Iowa Ct. App. Nov. 26, 2003) ("Of the approximately eighty thousand dollars worth of property she received, less than one half of that amount was in cash or other liquid assets available to assist in her transition to self-

sufficiency."); *see also Wofford v. Wofford*, 20 So.3d 470, 474 (Fla. Dist. Ct. App. 2009) ("Bridge-the-gap alimony serves to assist a spouse already capable of self-support during the transition from being married to being single." (quoting *Yitzhari v. Yitzhari,* 906 So.2d 1250, 1255 (Fla. Dist. Ct. App. 2005)); *Violette v. Violette*, 120 A.3d 667, 673 (Maine 2015) ("A court may award transitional spousal support to provide for a spouse's transitional needs, including, but not limited to . . . short-term needs resulting from financial dislocations associated with the dissolution of the marriage." (altered for readability)); *Ingram*, 2018 WL 2749633, at *7 ("Transitional alimony is awarded where economic rehabilitation is unnecessary and is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. In essence, transitional alimony is a form of short-term bridge-the-gap support designed to smooth the transition of a spouse from married to single life." (altered for readability)).

Transitional spousal support is not warranted here. Line has a monthly net income of $1284. Line also received an award of $1000 a month in child support. Furthermore, as part of the property distribution, Line received the family home as well as $28,712.82. Line has the resources necessary to transition from being married to being single.

Although none of the generally-recognized forms of spousal support are applicable here, the majority affirms the award of spousal support, citing *In re Marriage of Becker* for the proposition that a spousal support award need not fall into any category. *See* 756 N.W.2d 822, 827 (Iowa 2008). While *Becker* is

frequently cited for this proposition, I think it a misreading of *Becker*. *Becker* did not state courts are free to fashion spousal support awards outside any traditionally-recognized category of support. Instead, *Becker* stated more than one of the traditionally-recognized forms of spousal support may be applicable to a particular case thus resulting in a hybrid award. *See id.* ("We cannot characterize the support we are awarding Laura as strictly rehabilitative or traditional spousal support. Factually, the support award may be a combination of both because this spousal support award will allow Laura to maintain the same standard of living she enjoyed during the marriage throughout the period of time it will take her to become self-sufficient at her maximum earning capacity. . . . [T]here is nothing in our case law that requires us, or any other court in this state, to award only one type of support."). The *Becker* court's statement that nothing in the law requires an award of "only one type of support" is not the same as saying nothing in the law requires an award to be at least one form of recognized support. *Gust* confirmed this more limited reading of *Becker*. In *Gust*, the court stated "[o]ur cases applying the statute have identified three kinds of support: traditional, rehabilitative, and reimbursement." 858 N.W.2d at 408. While the *Gust* court recognized "the categories may overlap in some cases," it did not state courts are free to award support outside of the generally-recognized categories. *See id.* (citing *Becker*, 756 N.W.2d at 827).

Even if *Becker* allowed for non-categorical forms of spousal support, the circumstances justifying such an award should be extraordinary. We should not be quick to recognize new categories of spousal support. Nor should we be too lax in applying the generally-recognized categories to the facts of a particular case.

Among the galaxy of cases, the generally-recognized categories of support are constellations providing guidance in navigating the otherwise uncharted waters of spousal support.

The spousal support in this case is a new form of spousal support—need-based spousal support. The majority asks whether the recipient spouse has a need and whether the other spouse has the ability to pay. If the answer to both questions is yes, then support should be awarded. In my view, if one spouse has a financial need, the next question should not be whether the other spouse has the ability to pay. Instead, the next question should be whether the facts and circumstances of the case are such that it would be equitable to require the other spouse to satisfy the need. The answer to that question is derived from looking at the constellation of principles embodied in the traditionally-recognized forms of spousal support. Only if one or more of the generally-recognized categories is applicable, i.e., only if it would be equitable to require spousal support, should we ask the question of whether the other spouse has the ability to satisfy the recipient spouse's need.

Here, there are no generally-recognized categories of spousal support applicable to the case at hand. There are no extraordinary circumstances justifying the departure from the traditional categories of spousal support. It is not equitable to force one spouse to subsidize a former spouse merely because he or she can. This is particularly true where, as here, the recipient spouse is voluntarily underemployed. I would this affirm the judgment of the district court but modify the decree to eliminate any award of spousal support.