TAYLOR, J.
 

 The former wife, Jodie C. Bell, appeals the trial court’s final judgment of dissolution of marriage and the denial of her motion for rehearing. The wife asserts the trial court erred in: (1) calculating the equalization payment by not including the wife’s half of the husband’s accounts receivable from loans he made to Royce and Bell Brothers, Inc.; (2) failing to make factual findings before denying the wife bridge-the-gap alimony; and (3) failing to reserve jurisdiction on the determination of the wife’s attorney’s fees. The former husband, Mitchell K. Bell, filed a cross-appeal as to the court’s final judgment, asserting that the court erred in equitably distributing the equity in the home he inherited from his mother, and in equitably distributing the Ford Explorer, an asset that was disposed of during the dissolution proceedings by the parties’ agreement. We reverse and remand as to all issues, except the wife’s third issue regarding failure to reserve jurisdiction on the determination of attorney’s fees. On this issue, we affirm.
 

 The husband and the wife were married on January 19, 1997. The wife filed a petition for dissolution of marriage on February 28, 2007. Several hearings were held on the dissolution petition in September 2009. Gary Trugman, the wife’s expert C.P.A. and business appraiser, testified that the husband was a fifty-percent owner in both Precision Time Systems, Inc. (“Precision”) and Royce Parking Control Systems (“Royce”). The husband is the CEO and manager of Royce; the husband’s brother, Robert Bell, manages Precision. The valuation date, by stipulation, was February 28, 2007. Trugman testified that as of this date, the husband’s interest in Precision was worth approximately $2,731,000. He testified that the husband’s stock in Royce was worth $647,000. Royce had a negative book value, but still had a positive fair market value.
 

 Richard Briscoe, a C.P.A., testified for the husband. He said that Precision Time Systems, Inc. was started before the parties married, in August 1992; Robert and the husband are fifty-percent owners. Briscoe testified that Bell Brothers, Inc. was set up to hold ownership of Royce’s stock. Royce was purchased in 2001. Bell Brothers held the stock and financed the transaction. Briscoe agreed that “they borrowed money to purchase Royce in which the borrowed money is still outstanding, and so whatever value Royce could have, the other entity, Bell Brothers, Inc., which holds the stock of Royce, must be paid if there was a sale, and therefore, on a net asset sale, the debt would wipe out any gain.”
 

 Regarding equitable distribution, Bris-coe testified that “my value for receivables from Royce are, if you add them together, are roughly $650,000. And then I have a zero value for Royce itself in Bell Brothers. If you look at their schedule, they have zero on the notes, but they have about 670 on Royce.” Briscoe stated that if you take the value of Royce, it has to be in consideration of the debt.
 

 In his valuation of the husband’s assets contained within his Exhibit book, Briscoe showed a Note Receivable Summary, which indicated a Royce Note Receivable equaled $275,283 and a Bell Brothers Note Receivable equaled $385,328. Briscoe testified to these amounts at the hearing as follows:
 

 WEISSMAN [the husband’s counsel]:
 

 ... Then what else about notes receivable?
 

 
 *324
 
 BRISCOE: Notes receivable, there’s a number of different receivables from tax payments that were coming back. Mr. Kridel and I have worked all those out.
 

 I think the largest items there deal with a note receivable from Royce and then a note receivable from Bell Brothers.
 

 WEISSMAN: You need to stop for a moment and kind of explain that to the Court, please.
 

 BRISCOE: Well, the way I valued them, Your Honor, is a net asset value, so since I left the liabilities on the books, then I had to pick up an asset individually-
 

 In their particular instance, they took the liability off the books so they didn’t pick up the asset. That’s the only difference. But actually, when you look at the difference, my value for the receivables from Royce are, if you add them together, are roughly $650,000. And then I have a zero value for Royce itself in Bell Brothers. If you look at their schedule, they have zero on the notes, but they have about 670 on Royce.
 

 So as far as Royce goes, we’re not apart. It’s either in the receivables or it’s in the entity. So that’s really just a few thousand dollars apart on the valuation of Royce as it affects this marital net worth.
 

 * ⅜ *
 

 WEISSMAN: ... I understand how you and Mr. Trugman differed on the valuation. But the receivable notes are assets of [the husband]?
 

 BRISCOE: Individually.
 

 WEISSMAN: Individually?
 

 BRISCOE: Yes.
 

 WEISSMAN: Because they belong to the entity known as Royce?
 

 BRISCOE: They are payables on Royce’s books. And if we could use Royce as Bell Brothers and Royce together-
 

 WEISSMAN: I understand what you’re saying. If you’re going to give a value to Royce, you have to take into consideration the debt?
 

 BRISCOE: Yes.
 

 WEISSMAN: Okay. And if you’re going to say Royce is worthless, which you do, then you still have to take into consideration that Royce has an asset and that assets are the notes?
 

 BRISCOE: They have liability to [the husband] individually.
 

 WEISSMAN: Individually?
 

 BRISCOE: That’s right.
 

 WEISSMAN: And he has to account for that to [the wife]?
 

 BRISCOE: Exactly.
 

 WEISSMAN: And so the way you accounted for it is to put it under “other”? BRISCOE: Yes.
 

 WEISSMAN: I see. Not that you were trying to tell the Court that [the husband] should be forgiven of the monies that were receivable against the value of Royce?
 

 BRISCOE: No. No.
 

 WEISSMAN: Okay.
 

 BRISCOE: If you collapse my value with the notes, it’s very similar to their value with the notes. It just happens— It’s just a different manner of valuing them.
 

 WEISSMAN: Okay. So [the husband] picks up what in receivable notes?
 

 BRISCOE: He picks up from Royce, he picks up $275,283.
 

 WEISSMAN: Yes.
 

 BRISCOE: And from Bell Brothers he picks up $385,328.
 

 WEISSMAN: So we’re not forgetting that fact that there really is an asset out
 
 *325
 
 there that [the husband] now has to account to [the wife] for?
 

 BRISCOE: We are not.
 

 WEISSMAN: Okay. Got it.
 

 As to the house the husband inherited from his mother, the husband testified that he made mortgage payments on his mother’s house before she died because she “had Stage IV breast cancer and her earnings were somewhat limited, and being a son, that’s what I was able to do.” The wife knew about these payments and agreed to them. She never indicated that she would seek repayment or any sort of return for these payments made on behalf of the husband’s mother.
 

 Robert Bell testified that when his mother passed away, she willed her house to his brother (the husband) and him. The house was sold for $29,994. The wife testified she did not know if the husband inherited the house and admitted that she had no reason to doubt that the money was an inheritance. Further, Kridel, the wife’s C.P.A., testified that the husband received an inheritance upon his mother’s death, which included the home at issue.
 

 Kridel testified that he used NADA values for the Ford Explorer, but Briscoe did not include the values because it was driven by the husband’s son. Kridel did not know whether the Explorer was purchased by the husband and the wife for the son or if it was purchased by the son, though he did not believe title was in the son’s name. Briscoe testified he does not include the children’s cars, because they are usually gifts to the children.
 

 The husband testified that his son, Jason, had a 2001 Ford Explorer that they bought used; the car was then given to the wife’s son, Josh (the husband’s stepson). Because the car needed major repairs, the husband did not think it was safe; they sold it to Cash for Clunkers and the husband leased Josh another car. The wife needed to sign the title for the husband to do this. This was done three to four months before the hearings.
 

 The court entered its final judgment of dissolution of marriage. The court found that Royce had a zero value and Precision had a value of $630,290, and that the wife was entitled to an equalization payment of $296,352 from the husband. The court made no findings as to the $660,611 in accounts receivables due the husband in its valuation of Royce and Precision. The court denied the wife’s request for alimony and made findings only as to her education, previous employment, the parties’ vocational experts’ testimony, and a possible range of salaries. Regarding the sale proceeds from the husband’s mother’s home, the court accepted the wife’s position that these should be categorized as marital because the mortgage payments were made during the marriage and the proceeds should be equitably distributed. The court also considered the Ford Explorer as marital and belonging to the husband.
 

 The wife first argues that the trial court erred in failing to include the husband’s $660,611 accounts receivable from Royce and Bell in the final judgment equalization chart and in equitably distributing this amount. We agree.
 

 Section 61.075(3), Florida Statutes (2009), provides, in pertinent part, that
 

 (3) In any contested dissolution action wherein a stipulation and agreement has not been entered and filed, any distribution of marital assets or marital liabilities shall be supported by factual findings in the judgment or order based on competent substantial evidence with reference to the factors enumerated in subsection (1). The distribution of all marital assets and marital liabilities, whether equal or unequal, shall include specific
 
 *326
 
 written findings of fact as to the following:
 

 (a) Clear identification of nonmarital assets and ownership interests;
 

 (b) Identification of marital assets, including the individual valuation of significant assets, and designation of which spouse shall be entitled to each asset.
 

 This statute “requires specific written findings of fact as to identification of non-marital and marital assets, valuation of significant marital assets, designation of which spouse shall be entitled to each asset, and other findings necessary to advise the parties or the reviewing court of the trial court’s rationale for the distribution of marital assets and allocation of liabilities. The distribution of marital assets or liabilities must be supported by factual findings in the judgment based on competent substantial evidence.”
 
 Crockett v. Crockett,
 
 708 So.2d 329, 330 (Fla. 1st DCA 1998) (citing § 61.075(3), Fla. Stat. (1995)).
 

 In his valuation of the husband’s assets contained within his Exhibit book, Briscoe showed a Note Receivable Summary, which indicated a Royce Note Receivable equaled $275,283 and a Bell Brothers Note Receivable equaled $385,328, which totaled $660,611. Briscoe agreed that the notes receivables were assets of the husband individually, because they were payables on Royce’s books. Briscoe also agreed that the husband has to account for this money to the wife. However, in the final judgment, the trial court made no mention of the $660,611 notes receivable in its findings regarding the value of Royce and Bell Brothers. This was error.
 

 In
 
 Crockett,
 
 the former husband appealed the trial court’s final judgment that failed to make any findings concerning a loan the former wife made to her son before filing the petition for dissolution of marriage. 708 So.2d at 330. The first district held that “[although the loan was made prior to the filing of the petition for dissolution, the amount receivable would still be a marital asset subject to equitable distribution.”
 
 Id.
 
 The court further found that the reason for the trial court’s failure to mention this loan or include this loan was not clear from the record.
 
 Id.
 
 It held that “[bjecause the loan might represent significant marital assets and was made only the month before the filing of the petition for dissolution, we remand the case for the trial court to make specific written findings regarding the loan and, if appropriate, to consider the loan in a refashioned equitable distribution.”
 
 Id.
 
 at 331.
 
 See also Rosenfeld v. Rosenfeld,
 
 597 So.2d 835, 838 (Fla. 3d DCA 1992) (indicating that a loan that would eventually be repaid can be a marital asset, subject to equitable distribution).
 

 Briscoe, in his testimony concerning this $660,611 in receivable notes, conceded that the husband had to account to the wife for these assets. Briscoe further testified that this was different than the actual valuation of Royce and Bell Brothers, which was zero. Briscoe agreed that the husband will ultimately receive $660,611 from Royce and Bell Brothers in payment of the receivable notes. The husband also agreed he owed the wife this money and that the $660,611 should be included in the equitable distribution chart. Accordingly, the final judgment should be reversed and remanded for the court to make specific written findings regarding these assets.
 

 The wife next asserts that the trial court erred by not awarding her bridge-the-gap alimony and by failing to make the requisite factual findings supporting its decision. Without commenting on whether the court erred in denying bridge-the-gap alimony, we agree that the court failed to
 
 *327
 
 make the appropriate findings and reverse and remand on that point alone.
 

 “ ‘The standard of review with respect to the award of alimony is whether the trial judge abused his discretion.’ ”
 
 Kareff v. Kareff
 
 943 So.2d 890, 893 (Fla. 4th DCA 2006) (quoting
 
 Vandergriff v. Vandergriff,
 
 456 So.2d 464, 466 (Fla.1984)). “A trial court’s decision with regards to the award of alimony is reversible only upon a showing that no reasonable person could arrive at such a result.”
 
 Geddes v. Geddes,
 
 530 So.2d 1011, 1016 (Fla. 4th DCA 1988) (citing
 
 Canakaris v. Canakaris,
 
 382 So.2d 1197 (Fla.1980)). Further, section 61.08(2) lists the factors the trial court “shall consider” in determining whether a party is entitled to alimony; section 61.08(1) requires the court to include findings of fact relative to these factors.
 
 Ondrejack v. Ondrejack,
 
 839 So.2d 867, 870 (Fla. 4th DCA 2003). “A failure to consider all of the mandated factors is reversible error.”
 
 Id.
 

 The parties were married for ten years; their marriage is thus considered a “gray-area” marriage.
 
 See e.g. Nichols v. Nichols,
 
 907 So.2d 620, 622 (Fla. 4th DCA 2005) (14-year marriage falls within “gray area”);
 
 Byers v. Byers,
 
 910 So.2d 336, 343 (Fla. 4th DCA 2005) (13-year marriage falls within “grey area”);
 
 Wofford v. Wofford,
 
 20 So.3d 470, 474 (Fla. 4th DCA 2009) (11-year marriage falls within “gray area”).
 
 But see Jaffy v. Jaffy,
 
 965 So.2d 825, 828 (Fla. 4th DCA 2007) (holding marriage just under 10 years short-term). For a marriage that falls within the “gray area” of length, “no presumption in favor of or against an award of alimony exists.”
 
 Ryan v. Ryan,
 
 927 So.2d 109, 112 (Fla. 4th DCA 2006) (citing
 
 Nichols,
 
 907 So.2d at 622). In such a case, the court has discretion to award alimony based on the statutory factors; failure to consider these factors requires reversal.
 
 Id.
 
 (citations omitted).
 

 We explained that “ ‘bridge-the-gap’ alimony is intended to smooth the transition between a higher standard of marital living and the standard that a spouse can provide for herself, and typically awarded for a very short period of time, such as in the instant case of just over a year of monthly payments. It is meant for situations where the court finds that permanent alimony is not appropriate, and where no rehabilitation is requested or needed, as in this case where the wife presented no rehabilitative plan at trial.”
 
 Robbie v. Robbie,
 
 726 So.2d 817, 820 n. 2 (Fla. 4th DCA 1999) (internal citations omitted). Moreover, “ ‘bridge-the-gap alimony is, by definition, designed to “aid the recipient spouse in making the transition from married life to being single.” It should be used to assist a spouse with legitimate, identifiable, short-term needs under such circumstances in which an award is reasonable and the other spouse has the ability to pay. Bridge-the-gap alimony is most appropriately awarded in instances where the receiving spouse is already employed, possesses adequate employment skills, and requires no further rehabilitation other than a brief time to ease the transition to single life.’ ”
 
 Cohen v. Cohen,
 
 39 So.3d 403, 406 (Fla. 4th DCA 2010) (citations omitted).
 

 Section 61.08, Florida Statutes (2009), sets forth the requirements for awarding or denying alimony. The trial court “shall include findings of fact relative to the factors enumerated in subsection (2) supporting an award or denial of alimony.” § 61.08(1). To determine an award of alimony, the court shall consider the following:
 

 (a) The standard of living established during the marriage.
 

 (b) The duration of the marriage.
 

 
 *328
 
 (c) The age and the physical and emotional condition of each party.
 

 (d) The financial resources of each party, the nonmarital and the marital assets and liabilities distributed to each.
 

 (e) When applicable, the time necessary for either party to acquire sufficient education or training to enable such party to find appropriate employment.
 

 (f) The contribution of each party to the marriage, including, but not limited to, services rendered in homemaking, child care, education, and career building of the other party.
 

 (g) All sources of income available to either party.
 

 Here, the trial court made sufficient findings as to some of the factors in the final judgment. For example, the court found that the parties were married in January 1997, that the wife filed her petition for dissolution in February 2007, that the wife was 49 years old, and that the husband was 52 years old. The court included the financial resources of the parties in the final judgment and illustrated such findings in the equitable distribution chart. However, the court failed to address the other statutory factors: (1) the standard of living of the parties established during the marriage; (2) the emotional and physical condition of the parties; (3) the time necessary for either party to acquire sufficient education or training to enable such party to find appropriate employment; and (4) the contribution of each party to the marriage.
 

 We have held that the standard-of-living factor is not a “super factor trumping all other factors in awarding alimony.”
 
 Jaffy,
 
 965 So.2d at 828. However, the trial court must still consider it pursuant to section 61.08(2)(a). The trial court concluded that the wife was employable, but failed to articulate any facts regarding her physical or emotional well-being.
 

 As to the “the time necessary for either party to acquire sufficient education or training to enable such party to find appropriate employment,” the court found that the wife had a degree from the University of Syracuse, that she worked previously in property management, and that if she obtained the appropriate licenses, she would be employable. However, the court made no findings as to how long it would take the wife to become employable in such a capacity. Finally, the court failed to make any findings as to “[t]he contribution of each party to the marriage, including, but not limited to, services rendered in homemaking, child care, education, and career building of the other party,” and did not sufficiently set forth the sources of income available to the parties. Overlooking or omitting these statutory factors in the final judgment of dissolution requires reversal and remand for the appropriate findings.
 
 Ryan,
 
 927 So.2d at 112.
 

 The husband cross-appeals the trial court’s final judgment of dissolution, asserting that the court erred by equitably distributing the equity in his mother’s home, which was an inheritance, and by allotting the value of the Ford Explorer to him. We agree.
 

 “ ‘The standard of review of a trial court’s determination of equitable distribution is abuse of discretion.’ ”
 
 Bardowell v. Bardowell,
 
 975 So.2d 628, 629 (Fla. 4th DCA 2008) (quoting
 
 Kovalchick v. Kovalchick,
 
 841 So.2d 669, 670 (Fla. 4th DCA 2003)). However, “[a] trial court’s legal conclusion that an asset is marital or non-marital is subject to de novo review.”
 
 Mondello v. Torres,
 
 47 So.3d 389, 392 (Fla. 4th DCA 2010) (citations omitted).
 

 The trial court, in its final judgment, found that the husband and wife, during the marriage, gave the husband’s mother money for support and for her
 
 *329
 
 mortgage. Upon her death, the mother left her home to the husband and his brother, Robert. The home was thereafter sold in April 2007 (after the petition for dissolution was filed), and the husband received $29,975, his portion of the sale proceeds. The wife argued that this should be equitably distributed because the mortgage payments were made during the marriage, while the husband asserted that the money paid to the mother during her life was a gift and the property was not marital. The court accepted the wife’s position, categorized the $29,975 as marital, and equitably distributed it. This was error.
 

 Section 61.075(6)(b), Florida Statutes (2009), sets forth “nonmarital assets and liabilities,” which includes “2. Assets acquired separately by either party by non-interspousal gift, bequest, devise, or descent, and assets acquired in exchange for such assets.” Robert Bell testified that when his mother passed away, she willed her house to both him and the husband. The wife testified she did not know if the husband inherited the house and admitted that she had no reason to disbelieve that the money was an inheritance. Further, Kridel, the wife’s C.P.A., testified that the husband received an inheritance upon his mother’s death, which included the home at issue. Therefore, based on the facts adduced at trial, the house was nonmarital, an asset acquired by bequest or devise.
 

 Further, any asset acquired in exchange for an asset from a bequest or devise is nonmarital. § 61.075(6)(b)2. Here, the house was sold and the husband received his half of the proceeds, equaling $29,975. Therefore, this amount should also have been classified as nonmarital.
 

 The evidence adduced at trial showed that the husband, with the wife’s knowledge and acquiescence, gave money to his mother for support and to help her pay her mortgage. There was no evidence that this was not meant as a gift to the mother or that either party intended to be repaid. Kridel, when asked if the husband made a gift of this money to his mother, testified that he did not know what the intention was, but that the wife never said this was an investment property or that they would get something out of the house. The wife agreed on cross-examination that the husband paid these mortgage payments with the wife’s knowledge. Further, the husband testified that he did what he could to help his mother as a son, that the wife knew about and agreed to the payments, and that the wife never indicated that she would seek restitution for these payments made on behalf of the husband’s mother.
 

 Therefore, the trial court erred in finding the $29,975 to be marital property and dividing it in the equitable distribution schedule. The money, which was acquired in exchange for the asset received through a bequest or devise, never lost its status as such. There was no evidence that this was meant to be a loan or that it was meant to be repaid. Thus, the trial court erred in classifying it as marital.
 

 As to the Ford Explorer, the husband argues that the trial court erred by allotting the value of the Ford Explorer to him, where the evidence showed that the car was traded through Cash for Clunkers and no longer existed at the time of the dissolution. We agree. Kridel gave testimony concerning the value of the Ford Explorer, and the equitable distribution chart listed it as $4,275. Briscoe did not include the car because it belonged to the son. The husband testified that his son first had the Explorer, and then it was given to the wife’s son, Josh. Because the car needed repairs and was no longer safe, they traded it in through Cash for Clunkers. The husband testified this was done three or four months before the hearings,
 
 *330
 
 that the wife signed the title to accomplish this, and that the husband leased Josh another car. We find this was sufficient to establish that the value of the car no longer existed at the time of the dissolution of marriage proceedings. As such, the trial court erred in including this amount in the husband’s equitable distribution.
 

 We reverse and remand this case to the trial court for further proceedings consistent with this opinion.
 

 Affirmed in part, Reversed in part and Remanded.
 

 HAZOURI and CONNER, JJ., concur.