# IN THE SUPREME COURT OF IOWA

No. 20–0090

Submitted January 19, 2022—Filed March 18, 2022

**IN RE THE MARRIAGE OF SURAJ GEORGE PAZHOOR AND HANCY CHENNIKKARA PAZHOOR,**

Upon the Petition of **SURAJ GEORGE PAZHOOR,**

> Appellee,

and Concerning **HANCY CHENNIKKARA** f/k/a **HANCY CHENNIKKARA PAZHOOR,**

> Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

Former spouse seeks further review of court of appeals decision increasing alimony award. **DECISION OF COURT OF APPEALS AFFIRMED AS MODIFIED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED AND CASE REMANDED.**

Waterman, J., delivered the opinion of the court, in which all justices joined.

Jenny L. Weiss (argued) of Fuerste, Carew, Juergens & Sudmeier, Dubuque, for appellant.

Andrew B. Howie (argued) of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, and Darin S. Harmon and Jeremy N. Gallagher of Kintzinger, Harmon, Konrardy, P.L.C., Dubuque, for appellee.

**WATERMAN, Justice.**

On further review, a divorced physician is challenging the increase in spousal support ordered by the court of appeals. He invites us to formally recognize "transitional" alimony. Iowa courts have long considered three categories of spousal support: traditional, rehabilitative, and reimbursement, which can be blended for a hybrid award. The court of appeals in this case modified a hybrid traditional and rehabilitative alimony award. Concurring opinions of our court of appeals have foreshadowed the adoption of transitional alimony as a fourth category. For the reasons explained below, we now adopt transitional alimony as another tool to do equity in calculating spousal support. On our de novo review, we further modify the hybrid alimony award.

## I. Background Facts and Proceedings.

Suraj George Pazhoor and Hancy Chennikkara were married in India in 2002. Hancy had graduated from medical school in India and was completing her internship. She is a registered physician in India. Suraj had graduated from medical school in Russia and completed his internship in India. He was working and volunteering in the medical field in India when they married. After about a year of living with Suraj's parents in India, the couple relocated to Naperville, Illinois, to live with Hancy's parents. The couple later moved to their own residence. At the time, Hancy worked in a bookstore and Suraj worked day shifts at a college library and night shifts at a retailer.

Both Hancy and Suraj began studying to become licensed physicians in the United States. Suraj ultimately obtained his medical license; Hancy did not.

Licensure requires completion of the United States Medical Licensing Exam: a four-part test, commonly known as "the Boards". Passing the first three parts is required for residency. The fourth part is completed during residency. Upon passing part of the exam, the examinee has a limited amount of time to pass the remaining parts. Neither Suraj nor Hancy were successful on the first attempt. Suraj ultimately passed the third part and entered residency. Hancy never passed the third part. Their daughter was born in 2008. Hancy was preparing for her second attempt at the third part of the exam when she learned her father had been diagnosed with cancer. She continued to study "[b]ut the fear of failing again was overwhelming," and she never retook the exam.

Hancy used her medical degree to research and coauthor several published articles with a cardiologist, most recently in 2010. In 2012, after Suraj completed a three-year residency program at Loyola University Chicago, the couple agreed Suraj would accept a hospitalist position in Wisconsin and Hancy would care for their children and home. Their son was born in 2013 while they lived in Wisconsin. Suraj was promoted that year to serve as a director of a hospitalist fellowship program, which added to his responsibilities without an increase in his pay.

In 2016, Suraj accepted a position as a hospitalist and medical director at the Grand River Medical Group (GRMG) in Dubuque, Iowa. While Suraj focused on his career, Hancy ran the household, facilitated their moves, managed their finances, provided childcare, and focused on the children's development, education, medical care, and extracurricular activities. From 2008 to 2017,

Hancy earned no income. In 2017, she began volunteering as a religious education teacher on Wednesday and Sunday nights during the school year. Suraj's income in 2018 was $500,742. The family's lifestyle in Dubuque during the marriage was largely unbudgeted and reflected Suraj's substantial income.

Suraj petitioned for divorce on August 31, 2018. In response, Hancy began earning $12 an hour, or $918 annually, as a religious education teacher (instead of volunteering). She also began working part-time, up to twenty hours a week, as a barista at a local coffee shop for $8 an hour, or $8,320 annually. After Suraj filed for divorce, Hancy interviewed for a patient advocacy position at a local hospital. She was denied that employment because her foreign medical degree did not satisfy the requirement for a nursing degree. She earns passive income from a 10% interest in two commercial real estate holding companies ($13,387 average annual income over three years) and rental income from the Naperville condo ($490 annual net income). Her total annual income from these sources is $23,115.

The court conducted a two-day trial in August of 2019. The parties agreed that Hancy should receive spousal support but disagreed on its duration and amount. Suraj requested the court award Hancy $5,000 monthly for five years in spousal support, totaling $300,000. Hancy sought $12,000 monthly in traditional spousal support. Hancy argued the spousal support award, in part, should serve as reimbursement because she used her nonmarital funds to support the family while they lived in Naperville, put $9,000 of her money into

Suraj's individual retirement account, and sold some of her premarital jewelry to help with the down payment on their Wisconsin home.

Suraj was age forty-three at trial. His parents still lived in India. Suraj had earned $252,172 by August and was on track to earn $415,152 in 2019. He testified that after paying 46.5% of his income in taxes, his after-tax income is approximately $232,500 annually or $19,375 a month. Hancy was age forty at trial. Her father died ten years earlier but her mother still lived in Illinois. Because too much time had passed, Hancy would essentially have to start over the process to become licensed to practice medicine in the United States. Suraj agreed that it was too late for Hancy to take the Boards again. Hancy testified she is interested in earning a master's degree in public health, which would take two to three years to complete if she attended school full-time, assuming her credits from medical school transferred. If her credits do not transfer, she would need to complete additional undergraduate coursework. Hancy estimated she will earn up to $80,000 a year after she earns her master's. Suraj asserted that Hancy does not need additional education and could immediately return to a nonclinical role earning $100,000 to $200,000 a year. His assertions were not supported by expert testimony or other evidence.

Hancy estimated her monthly expenses to be $10,244, which included tuition for a master's program. According to Hancy's counsel, this estimate omitted "variable purchases for the children, including clothing, club membership dues, incidentals, personal grooming, laundry, allowances, life insurance, babysitting, church donations, gifts, or the ability to save for herself."

Suraj testified that he overstated his monthly expenses in his financial affidavit but estimates his monthly expenses to be at least $13,118, including allocations for vacations, clothing, and other incidentals, but not including contributions to his savings. In a brief filed with the district court during trial, Suraj discussed transitional alimony citing court of appeals decisions and advocated for a transitional award.

On October 18, the district court entered its decree dissolving the seventeen-year marriage. The court ordered shared custody and physical care of their children and divided their property. Each was awarded marital property valued at $337,754, and Hancy was able to retain premarital assets totaling $136,565. Hancy retained the Naperville condo, her vehicle, some bank accounts, and a portion of the marital debt as well as her premarital investment accounts and jewelry. The court ordered Suraj to pay Hancy $143,977 as an equalization payment from the property division, $643 a month in child support, and $7,500 monthly in spousal support for five years totaling $450,000. The court found Hancy "is more than a minimum wage employee" and "is, at the very least, capable of working full time at the hourly rate of $12.00, if she chooses to do so." The court imputed income of $40,000 to Hancy, which included $24,960 in estimated wages and her passive business income, the rental income, and child support. Pursuant to the dissolution decree, a Qualified Domestic Relations Order was filed awarding Hancy a 50% interest in the balance of Suraj's GRMG retirement plan as of October 18, 2019.

Hancy filed a motion to reconsider, enlarge, or amend the district court's order under Iowa Rule of Civil Procedure 1.904(2). She argued the spousal support award was inequitable and the court erred when it imputed a $40,000 income. The court denied her motion, and Hancy appealed.

On appeal, Hancy argued the district court erred by awarding shared physical care, reducing both Suraj's income and child support payment because he pays for the children's medical insurance, and failing to award her attorney fees. She also argued the spousal support award was inequitable and sought appellate attorney fees. Suraj argued the district court correctly determined those issues and opposed an award of appellate fees.

We automatically transferred the case to the court of appeals. The court of appeals affirmed the district court's shared physical care determination and denial of attorney fees for the district court proceedings. The court of appeals awarded Hancy $3,000 in appellate attorney fees. The court of appeals reversed the district court's decision to impute income to Hancy, assigned Hancy an income of $23,115, and increased the spousal support awarded to $9,000 monthly for seven years, $8,000 monthly for another three years, and $7,000 monthly for two more years, totaling $1,212,000. The decision further provided, "[If] Hancy remarries after the first seven-year period, but before expiration or satisfaction of the twelve-year spousal-support obligation, the support obligation shall terminate so long as Suraj is current on his obligations for support. In the event of the death of either party, the spousal support obligation shall terminate." The court "agree[d] with Hancy that Suraj is not entitled to a

deduction for the health-insurance premium attributable to the children, as it is already deducted to reach Suraj's gross income." The court of appeals recalculated Suraj's child support obligation to be "$527.22 for two children and $377.95 when only one child is eligible."

Suraj sought further review of the court of appeals award of spousal support. He concedes that he "will unquestionably continue to have a much higher income" than Hancy. He argues the increase in the spousal support award and duration "is excessive and unnecessary considering Hancy's previous education, her relatively young age, and years of future employability at a much higher level than her current job as a part-time church teacher and barista." Suraj asks us "to formally adopt transitional alimony as a fourth category of spousal support, vacate the spousal support provisions of the court of appeals' ruling, and affirm the district court's spousal support award." Hancy resisted. She argues Suraj did not preserve error as to transitional alimony while inaccurately asserting the issue was first raised in his application for further review. She contends that the additional spousal support awarded by the court of appeals is equitable. We granted Suraj's application.

**II. Scope of Review.**

"When considering an application for further review, we have discretion to review all the issues raised on appeal or in the application for further review or only a portion thereof." *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We exercise our discretion and limit our review to the spousal support

award, which in turn affects child support. The court of appeals opinion stands as the final decision on the remaining issues raised on appeal. *See id.*

Our review of alimony awards is de novo. *In re Marriage of Mann*, 943 N.W.2d 15, 18 (Iowa 2020). We give the district court considerable latitude, *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015), and will only disturb the award "when there has been a failure to do equity," *Mauer*, 874 N.W.2d at 106. "We give weight to the factual determinations made by the district court; however, their findings are not binding upon [this Court]." *Mann*, 943 N.W.2d at 18 (alteration in original) (quoting *Gust*, 858 N.W.2d at 406).

**III. Analysis.**

We first address whether to formally recognize transitional alimony. We disagree with Hancy's contention that Suraj failed to preserve error on that issue.[1] We begin with an overview of alimony law, including the governing statute and the different types of spousal support. We conclude that it is time to formally recognize transitional alimony and proceed to determine the appropriate award in this case.

"The question of whether to award alimony is a matter of discretion and not a matter of right." *Mann*, 943 N.W.2d at 20. The decision to award alimony depends on the particular facts and circumstances of each case. *Id.*; *see also In*

---

[1]As noted, Suraj argued for transitional alimony in district court. Although the district court did not award transitional alimony, we review its alimony award de novo. As appellee, Suraj was not required to file a brief on appeal. Iowa R. App. P. 6.903(3). His appellate brief argued the alimony awarded was equitable. After the court of appeals increased the spousal support, Suraj was free to challenge the higher award in his application for further review by arguing for transitional alimony.

*re Marriage of Becker*, 756 N.W.2d 822, 825–26 (Iowa 2008) ("Our prior cases are of little value in determining the appropriate alimony award, and we must decide each case on its own peculiar circumstances."). "The legislature has not authorized Iowa courts to employ any fixed or mathematical formula in applying spousal support." *Mauer*, 874 N.W.2d at 107. Instead, courts are instructed "to equitably award spousal support by considering" the criteria listed in Iowa Code section 598.21A(1). *Id.* Iowa Code section 598.21A(1) (2018) provides:

> Upon every judgment of annulment, dissolution, or separate maintenance, the court may grant an order requiring support payments to either party for a limited or indefinite length of time after considering all of the following:
>
>     *a.* The length of the marriage.
>
>     *b.* The age and physical and emotional health of the parties.
>
>     *c.* The distribution of property made pursuant to section 598.21.
>
>     *d.* The educational level of each party at the time of marriage and at the time the action is commenced.
>
>     *e.* The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
>
>     *f.* The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
>
>     *g.* The tax consequences to each party.[2]

---

[2]When awarding alimony, Iowa courts must "consider changes in the tax treatment of alimony." *Mann*, 943 N.W.2d at 21. "Under recently enacted federal tax law, alimony payments

*h.* Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

*i.* The provisions of an antenuptial agreement.

*j.* Other factors the court may determine to be relevant in an individual case.

Our review "need only mention those criteria relevant to the particular case." *Mann,* 943 N.W.2d at 20; *see also* Iowa Code § 598.21A(2).[3] Our cases supplement "the statutory mandate to consider each criterion set forth in section 598.21A(1)" by "establish[ing] the comparative weight or importance of certain statutory criteria relative to others." *Mauer,* 874 N.W.2d at 107.

We have recognized three types of alimony: rehabilitative, reimbursement, and traditional. *Mann,* 943 N.W.2d at 23. "Each type of spousal support has a different goal." *Becker,* 756 N.W.2d at 826.

> *Rehabilitative alimony* serves to support an economically dependent spouse through a limited period of education and retraining. Its objective is self-sufficiency. An award of *reimbursement alimony* is predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other. *Traditional alimony* is payable for life or for so long as a dependent spouse is incapable of self-support. The amount of

are no longer tax deductible [for the payor] and are not considered taxable income to the person receiving them." *Id.* (citing Tax Cuts and Jobs Act of 2017, Pub. L. No. 115–97, § 11051(a), 131 Stat. 2054, 2089 (2017) (repealing 26 U.S.C. § 215)).

[3]We have not adopted the American Academy of Matrimonial Lawyers (AAML) spousal support guidelines and they "are not Iowa law." *Mauer,* 874 N.W.2d at 108. "[T]herefore clearly [the guidelines] are not binding on Iowa courts" and cannot serve "as the starting point for a trial court nor as the decisive factor for a reviewing court on appeal." *Id.* We have said that "the AAML guidelines might 'provide a useful reality check with respect to an award of traditional spousal support.'" *Id.* (quoting *Gust,* 858 N.W.2d at 416 n.2). However, the AAML's guidelines for amount and duration relied on by Hancy were adopted on March 9, 2007. *See* Mary Kay Kisthardt, *Re-thinking Alimony: The AAML's Considerations for Calculating Alimony, Spousal Support or Maintenance,* 21 J. Am. Acad. Matrim. Law. 61, 80 app. A (2008). The guidelines have not been updated to reflect the recent changes to the federal tax code and can no longer serve as a "reality check" for spousal support awards in Iowa.

alimony awarded and its duration will differ according to the purpose it is designed to serve.

*In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998) (emphasis in original) (quoting *In re Marriage of O'Rourke*, 547 N.W.2d 864, 866–67 (Iowa Ct. App. 1996)). We allow hybrid awards designed to accomplish more than one of the foregoing goals. *Gust*, 858 N.W.2d at 408; *Becker*, 756 N.W.2d at 827–28.

**A. Recognizing Transitional Alimony.** Suraj urges that we formally recognize transitional alimony. Iowa cases have neither consistently defined nor formally recognized transitional alimony. *See, e.g.*, *In re Marriage of Hansen*, No. 17–0889, 2018 WL 4922992, at *16–17 (Iowa Ct. App. Oct. 10, 2018) (McDonald, J., concurring specially). In *In re Marriage of Mann*, we considered transitional alimony after concluding the spouse requesting alimony did not qualify for rehabilitative, reimbursement, or traditional alimony. 943 N.W.2d at 23.

> To the extent Iowa Code section 598A.21A(1)(*e*) directs us to consider time and expenses necessary to acquire sufficient education or training to enable the party to find appropriate employment, we note that such transitional alimony is usually appropriate in the context of a traditional marriage where a spouse has surrendered economic opportunities and needs a period of time to get retooled to enter the work force.

*Id.* We declined to award transitional alimony because the spouse requesting alimony likely only needed "a three-hour training proposition" to help improve his earning capacity—not a multiple-year accommodation. *Id.* In defining transitional alimony, we cited *In re Marriage of Becker*, 756 N.W.2d at 826–27, where support was awarded to permit the recipient spouse "to return to school and obtain her master's degree" and "develop her earning capacity past an

entry-level position." *Mann*, 943 N.W.2d at 23. The *Becker* court was unable to "characterize the support award as purely rehabilitative or traditional." *Becker*, 756 N.W.2d at 828.

The term "transitional" has been used interchangeably with "rehabilitative." *See, e.g.*, *Smith*, 573 N.W.2d at 926–27 ("Although the district court described its award as 'transitional' rather than 'rehabilitative,' the terms have been used interchangeably."); *In re Marriage of Christensen*, 543 N.W.2d 915, 919 (Iowa Ct. App. 1995) (affirming an eighteen-month rehabilitative alimony award "for assistance during a transitional period" even though the recipient spouse was "capable of supporting herself financially"); *In re Marriage of Wertz*, 492 N.W.2d 711, 714 (Iowa Ct. App. 1992) (en banc) (affirming a thirty-six month transitional alimony award because the recipient spouse can become self-supporting with "the additional training necessary to update her teaching certificate").

In *In re Marriage of Hansen*, the concurring opinion urged the adoption of an alternative interpretation of transitional alimony as a "distinct fourth category of spousal support." 2018 WL 4922992, at *16. In this view, "transitional support applies where the recipient spouse may already have the capacity for self-support at the time of dissolution but needs short-term assistance in transitioning from married status to single status due to the economic and situational consequences of dissolution." *Id.* at *17. For transitional alimony, "[t]he critical consideration is whether the recipient party has sufficient income and/or liquid assets to transition from married life to single life without undue hardship." *Id.*

Transitional alimony is not centered on retraining and the growth of human capital, which is the focus of rehabilitative alimony. *Id.*

Iowa cases have awarded spousal support to achieve transitional goals. *Id.* at *16; *see also In re Marriage of Lange*, No. 16–1484, 2017 WL 6033733, at *3 (Iowa Ct. App. Dec. 6, 2017) ("While the district court denominated the support here as rehabilitative, Jessica does not need traditional rehabilitative support so much as transitional support while finding suitable employment."); *In re Marriage of Lee*, No. 10–0948, 2011 WL 227573, at *7 (Iowa Ct. App. Jan. 20, 2011) (awarding alimony that "doesn't fit precisely within either the rehabilitative or reimbursement categories" because the recipient spouse does not need any additional training and left a "twelve-year marriage in her mid-thirties and in good health"); *In re Marriage of Byrne*, No. 03–0788, 2003 WL 23220082, at *2– 3 (Iowa Ct. App. Nov. 26, 2003) (extending an award of "short period of transitional alimony to assist her re-entry into the workforce and to gain self-sufficiency" from one year to three years although the recipient spouse "has a college degree and employable skills").

Other states recognize transitional alimony as a distinct justification for spousal support. *See, e.g.*, *Silvan v. Alcina*, 105 P.3d 117, 124 (Alaska 2005) ("Reorientation support 'is essentially transitional and may be awarded for brief periods to provide support pending the sale of marital property or to enable a spouse to get a job appropriate to the spouse's existing skills.' " (quoting *Davila v. Davila*, 908 P.2d 1025, 1027 (Alaska 1995))); *Evtimov v. Milanova*, 300 S.W.3d 110, 117 (Ark. Ct. App. 2009) (holding alimony can be awarded as "a

'bridge-the-gap' measure to aid the recipient spouse in making the transition from married life to being single"); *Bell v. Bell*, 68 So. 3d 321, 327 (Fla. Dist. Ct. App. 2011) (concluding bridge-the-gap alimony "should be used to assist a spouse with legitimate, identifiable, short-term needs" and "is most appropriately awarded in instances where the receiving spouse is already employed, possesses adequate employment skills, and requires no further rehabilitation other than a brief time to ease the transition to single life" (quoting *Cohen v. Cohen*, 39 So. 3d 403, 406 (Fla. Dist. Ct. App. 2010))); *Murphy v. Murphy*, 816 A.2d 814, 818 (Me. 2003) (holding one of the reasons courts may award transitional spousal support is to address "short-term needs resulting from financial dislocations associated with the dissolution of the marriage" (quoting Me. Stat. tit. 19-A, § 951-A(2)(B)(1) (2002))); *Zaleski v. Zaleski*, 13 N.E.3d 967, 971 n.9 (Mass. 2014) (defining transitional alimony as "the periodic or one-time payment of support to a recipient spouse after a marriage of not more than [five] years to transition the recipient spouse to an adjusted lifestyle or location as a result of the divorce" (alteration in original) (quoting Mass. Gen. Laws. ch. 208, § 48 (2012))); *Galassi v. Galassi*, 203 P.3d 161, 164 (N.M. Ct. App. 2009) (holding rehabilitative spousal support is used to increase the earning capacity of the recipient and "may be conditioned on compliance with a rehabilitation plan" while transitional support "supplement[s] the receiving spouse's income for a stated period" without requiring a rehabilitation plan); *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012) ("Where economic rehabilitation is unnecessary, transitional alimony may be awarded. . . . '[T]ransitional alimony is designed to aid a spouse

who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income.'" (quoting *Gonsewski v. Gonsewksi*, 350 S.W.3d 99, 109 (Tenn. 2011))).

The court of appeals has also addressed transitional alimony in recent decisions. *See, e.g., In re Marriage of Brown*, No. 19–0705, 2020 WL 569344, at *6, *6 n.7 (Iowa Ct. App. Feb. 5, 2020) (awarding transitional alimony); *In re Marriage of Jenn*, No. 18–1458, 2019 WL 5424938, at *3 (Iowa Ct. App. Oct. 23, 2019) (declining to award transitional alimony when the former spouse requesting support refuses to work). In *In re Marriage of Brown*, the court of appeals awarded transitional alimony when the recipient spouse had bachelor's and master's degrees and was currently employed as a kindergarten teacher. 2020 WL 569344, at *1, *6. While the recipient spouse did not need any training, she "will suffer financial hardship transitioning to single life and needs short-term assistance due to the economic and situational consequences of dissolution and an award of spousal support is appropriate." *Id.* at *6.

The goal in awarding alimony is to do equity. *See, e.g.*, Iowa Code § 598.3 ("An action for dissolution of marriage shall be by equitable proceedings . . . ."); *Mauer*, 874 N.W.2d at 107 ("[Iowa's legislature] has instructed courts to equitably award spousal support by considering each of the [statutory] criteria."); *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996) (en banc) ("Even though our review is de novo, we accord the trial court considerable latitude in making this determination and will disturb the ruling only when there has been

a failure to do equity."); *In re Marriage of Geil,* 509 N.W.2d 738, 742 (Iowa 1993) ("Thus we believe the modest alimony awarded by the court was an appropriate means of remedying the financial inequity created by the dissolution."); *In re Marriage of Francis,* 442 N.W.2d 59, 62 (Iowa 1989) (en banc) ("We conclude, however, that for marriages of short duration which are devoted almost entirely to the educational advancement of one spouse and yield the accumulation of few tangible assets, alimony—rehabilitative, reimbursement, or a combination of the two—rather than an award of property, furnishes a fairer and more logical means of achieving the equity sought under [our precedent]."); Cynthia Lee Starnes, *Alimony Theory,* 45 Fam. L.Q. 271, 291 (2011) ("All the theorists surveyed identified virtually the same problem: marital roles often leave spouses with disparate earning capacity at divorce, and if divorce law does not address this disparity, significant inequities may result.").

We conclude that formal recognition of transitional alimony will assist the bench and bar. There are inequities in dissolution beyond a spouse's "economic sacrifices" that "directly enhance[d] the future earning capacity of the other," a spouse's need for education or retraining to become self-sufficient, or a spouse's responsibility to support the other "so long as a dependent spouse is incapable of self-support." *Smith,* 573 N.W.2d at 926 (quoting *O'Rourke,* 547 N.W.2d at 866–67). There may be a need for short-term support in some cases to help "transition from married life to single life." *Hansen,* 2018 WL 4922992, at *17. Transitional alimony can ameliorate inequity unaddressed by the other recognized categories of support. Divorcing spouses must adjust to single life. If

one is better equipped for that adjustment and the other will face hardship, then transitional alimony can be awarded to address that inequity and bridge the gap. We now formally recognize transitional alimony as another tool to do equity.

**B. The Spousal Support Award.** We next review the spousal support awarded to Hancy. We begin our analysis by applying the statutory factors within Iowa Code section 598.21A(1). Then, we address each type of alimony before determining the amount and duration of an equitable hybrid alimony award in this case.

1. *Statutory factors.* Seventeen years is by no means a short marriage and weighs in favor of a substantial alimony award. *See* Iowa Code § 598.21A(1)(*a*). Both parties are in good physical and emotional health and do not have conditions that impede their ability to hold a full-time job and share physical care of their children. Neither Hancy nor Suraj is near retirement. While Hancy is employable, Suraj will undoubtedly have a much higher income than Hancy for the remainder of their working years. We agree with the court of appeals that this factor weighs in favor of spousal support. *See id.* § 598.21A(1)(*b*). Each has assets of roughly equal value in the property division, while Hancy retained her premarital property. Hancy's property award does not overshadow Suraj's comparatively large earning capacity. *See id.* § 598.21A(1)(*c*).

While both parties earned medical degrees prior to marriage, only Suraj has been licensed to practice medicine in the United States. This weighs heavily in favor of support. *See id.* § 598.21A(1)(*d*).

As for Hancy's earning capacity, we agree with both the district court and the court of appeals that the record does not support a finding that Hancy could earn a six-figure salary if she were to immediately return to the medical field. The court of appeals correctly measured Hancy's earning capacity at $23,115 because "[n]o evidence was presented concerning any full-time employment Hancy could obtain while sharing care for two young children and pursuing her master's degree." She has a foreign medical degree and is a licensed physician in India but lacks the qualifications to be a physician in the United States. She had been out of the workforce for nearly a decade before Suraj filed for divorce. Because Hancy and Suraj will share physical care of their children, Hancy needs time and financial resources to complete her master's degree. This factor weighs heavily in favor of support. *See id.* § 598.21A(1)(*e*).

During their marriage, the family's lifestyle reflected Suraj's substantial income. Hancy cannot support herself at a standard of living comparable to the lifestyle she enjoyed while married to him. This factor weighs in favor of alimony. *See id.* § 598.21A(1)(*f*).

Alimony payments are no longer tax-deductible, enhancing the burden on the payor, and alimony is no longer considered taxable income to the recipient, enhancing the value of the award. *See Mann*, 943 N.W.2d at 21. Suraj's after-tax annual income is approximately $232,500, or $19,375 a month. *See* Iowa Code § 598.21A(1)(*g*).

The parties agree alimony is warranted, but they disagree over the amount and duration. The statutory factors favor an award of substantial alimony. We next consider the types of alimony.

2. *Traditional alimony.* "The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *Gust*, 858 N.W.2d at 408 (quoting *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997) (en banc)). "[A]n award of traditional spousal support is normally payable until the death of either party, the payee's remarriage, or until the dependent is capable of self-support at the lifestyle to which the party was accustomed during the marriage." *Id.* at 412.

"[D]uration of the marriage is an important factor" to consider when awarding traditional alimony. *Id.* at 410. It is "often used in long-term marriages where life patterns have been largely set and 'the earning potential of both spouses can be predicted with some reliability.' " *Id.* (quoting *Francis*, 442 N.W.2d at 62–63). "[P]articularly in a traditional marriage, when the parties agree a spouse should stay home to raise children, the economic consequences of absence from the workplace can be substantial." *Id.* Marriages lasting twenty years or more are generally considered long-term, *id.* at 410–11; however, that is not required, *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486–87 (Iowa 2012) (affirming a traditional alimony award following a sixteen-year marriage); *In re Marriage of Witherly*, 867 N.W.2d 856, 857, 860 (Iowa Ct. App. 2015) (affirming a sixteen-year alimony award following a seventeen-year marriage).

The award and duration of a traditional alimony award "is primarily predicated on need and ability." *Gust*, 858 N.W.2d at 411 (quoting *In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998) (en banc)). A determination that a spouse needs alimony is based on "the ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.' " *Id.* (quoting Iowa Code § 598.21A(1)(*f*)). We focus on the earning capacity of the spouses, not their actual income. *Id.* "With respect to ability to pay, we have noted that '[f]ollowing a marriage of long duration, we have affirmed awards both of alimony and substantially equal property distribution, especially where the disparity in earning capacity has been great.' " *Id.* (alteration in original) (quoting *Geil*, 509 N.W.2d at 742). If "a spouse does not have the ability to pay traditional spousal support, however, none will be awarded." *Id.* at 412. "Ideally, the support should be fixed so the continuation of both parties' standard of living can continue, if possible." *In re Marriage of Stenzel*, 908 N.W.2d 524, 534 (Iowa Ct. App. 2018).

Hancy and Suraj assumed different roles. Hancy took care of the children and the home. Suraj earned the income to support the family. The economic consequences of their shared decision warrant an alimony award. Hancy's prospective earning capacity is dwarfed by Suraj's. Yet with her property award, additional education, and substantial alimony, she can become self-sufficient.

Next, Suraj has the ability to pay. Suraj currently earns approximately $19,300 monthly after taxes, which is adequate to support a substantial award. *See Mauer*, 874 N.W.2d at 111. With the expected retraining, Hancy's earning

capacity will likely increase as she becomes self-sufficient. Hancy is not entitled to lifetime alimony given her age, health, potential earnings, and the seventeen-year duration of their marriage. Indeed, a purely traditional award would require Suraj to pay alimony for a longer period than he was married to Hancy. But we give weight to the factors supporting traditional alimony in modifying the hybrid award.

3. *Rehabilitative alimony.* "Rehabilitative spousal support is 'a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting.'" *Becker*, 756 N.W.2d at 826 (quoting *Francis*, 442 N.W.2d at 63). It is awarded to help the recipient spouse become self-sufficient "and for that reason 'such an award may be limited or extended depending on the realistic needs of the economically dependent spouse.'" *Id.* (quoting *Francis*, 442 N.W.2d at 64).

In *Becker*, the parties were married for twenty-two years and had four children who were all high school age or older at the time of the divorce. *Id.* at 825. The parties made the "express or implied decision" that the husband would focus on growing his business and the wife "would be responsible for maintaining the home and raising the children." *Id.* at 826. "This arrangement became very successful financially. The family lived in a half-million-dollar home, belonged to the country club, and took numerous vacations." *Id.* At the time of the divorce, the parties "had accumulated assets in excess of 6.6 million dollars, and after taxes [the husband] was earning over one-half million dollars a year."

*Id.* The wife's earning capacity was $30,000 at best. *Id.* at 827. Each was awarded more than 3.3 million dollars of property during the dissolution proceedings. *Id.* We awarded the wife spousal support: $8,000 per month for three years, allowing time for her to complete a master's degree, and then $5,000 per month for seven years, allowing time for her to "develop her earning capacity past an entry-level position." *Id.* We characterized the award as a combination of rehabilitative and traditional alimony. *Id.* at 828.

Here, the parties made the joint decision to have Hancy assume primary responsibility for the house and children while Suraj focused on his career. As a result of that decision, Hancy took a nearly decade-long break from the workforce and never started her career in the medical field. Suraj and Hancy agree it is more realistic for her to pursue a master's program instead of attempting to become a licensed physician. This path could require undergraduate coursework, up to three years of study, and the financial ability to take unpaid opportunities—as Suraj did—to advance her career. The alimony award should reflect Hancy's desire to pursue a master's degree in public health. We conclude Hancy is entitled to rehabilitative alimony.

4. *Reimbursement alimony.* Reimbursement alimony "is predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other." *Francis*, 442 N.W.2d at 64. Such award "should not be subject to modification or termination until full compensation is achieved. Similar to a property award, but based on future earning capacity rather than a division of tangible assets, it should be fixed at

the time of the decree." *Id.* It is distinguishable from rehabilitative or traditional alimony because reimbursement alimony "is designed to give the 'supporting' spouse a stake in the 'student' spouse's future earning capacity, in exchange for recognizable contributions to the source of that income—the student's advanced education." *Id.* at 63.

Reimbursement alimony is most appropriate when a spouse contributed to the other's earning capacity and cannot otherwise be compensated for their contributions. *See In re Marriage of Lalone*, 469 N.W.2d 695, 697 (Iowa 1991) (en banc). In *In re Marriage of Lalone*, the parties were married for approximately eighteen years. *Id.* at 696 (Iowa 1991). Both worked full-time until the birth of their first child. *Id.* After that, the wife "worked only part-time, averaging less than $5000 per year in income," and "assumed the primary responsibilities for the home and child care." *Id.* At the time of the divorce, she was not employed outside the home. *Id.* During the marriage, the husband was able to focus on his career and average an income "in excess of $100,000 for the five years preceding the dissolution." *Id.* We noted *Lalone* is not similar to *In re Marriage of Francis*, where "the wife directly increased the husband's earning capacity by assisting in his obtaining a medical degree." *Id.* at 697; *see also Francis*, 442 N.W.2d at 61, 64–66 (awarding reimbursement alimony for the wife's homemaker and financial contributions when the husband was in medical school and the parties divorced during his residency). "Rather, the district court found, and we agree, that both [parties] contributed to the success of the family unit and were rewarded with financial success. We believe that the equal division of the marital property

adequately compensated [the wife] for any contributions made by her." *Lalone*, 469 N.W.2d at 697.

Suraj had already completed medical school before they married. Both Suraj and Hancy worked part-time while studying for the Boards. Suraj was successful. Hancy was not. Hancy testified she used her premarital assets to pay for the family's living expenses, including childcare so that she could study—not Suraj—for the third part of the licensing exam. When the family moved for Suraj's career, Hancy made no contemporaneous economic sacrifice because she did not have paid employment. And unlike the couple in *Francis*, Hancy and Suraj divorced well after he completed his residency. To the extent that Hancy provided homemaker services and financial support during the marriage that directly enhanced Suraj's earnings capacity, she was compensated by the division of the marital property that accumulated from Suraj's earnings. *See id.* We conclude Hancy is not entitled to reimbursement alimony.

5. *Transitional alimony.* As we now recognize, transitional alimony is appropriate when a party capable of self-support nevertheless needs short-term financial assistance to transition from married to single life. Transitional alimony is not needed when the recipient has sufficient income or liquid assets to facilitate the change to single life. We decline to require a showing of undue hardship and instead rely on district courts to do equity when awarding transitional alimony to "bridge the gap" from married to single life. *See Evtimov*, 300 S.W.3d at 117; *Bell*, 68 So. 3d at 327.

Hancy is pursuing a master's degree while she is transitioning from married life to single life. She was not awarded the marital home and must find a new residence, obtain her own health insurance, and the like. However, Hancy was awarded approximately $475,000 in marital and nonmarital property in the dissolution decree, with an estimated $300,000 in cash including the equalization payment. We conclude Hancy is not entitled to transitional alimony.

6. *The duration and amount of her alimony award.* The district court awarded $7,500 monthly in spousal support for five years, or $450,000 total. We agree with the court of appeals that the district court award is inequitable given the parties' disparity in income and the time it will take Hancy to obtain her master's degree to enhance her earning capacity while working part-time and sharing physical care of the two children. The district court's award would not allow Hancy "to maintain the same standard of living she enjoyed during the marriage throughout the period of time it will take her to become self-sufficient at her maximum earning capacity." *Becker*, 756 N.W.2d. at 827. Equity requires an award of substantial duration and amount. The parties agree that Hancy will never obtain an earning capacity approaching Suraj's. He can afford to pay substantial alimony, the disparity in the parties' earning capacity is great, and the marriage lasted seventeen years.

The court of appeals awarded Hancy hybrid alimony of $9,000 monthly for seven years, $8,000 monthly for another three years, and $7,000 monthly for two more years for a total span of twelve years and $1,212,000. We consider its modified award too long in duration. Seven years should be sufficient for Hancy

to complete her master's degree and enhance her earning capacity while working part-time and sharing physical care of their children. At that time, their children will be teenagers, facilitating Hancy's ability to work full-time. The child support paid by Suraj will increase substantially when his alimony ends. We also consider $9,000 monthly too generous.

After considering the factors in section 598.21A(1) and the goals of hybrid traditional and rehabilitative alimony, we modify the alimony award to $8,500 monthly for seven years. We vacate the court of appeals alimony award for years eight through twelve. This modification requires a recalculation of child support, which the district court shall determine on remand.

**IV. Conclusion.**

For these reasons, we affirm as modified the decision of the court of appeals and affirm the district court judgment as modified. We remand the case for the district court to recalculate child support. Costs on appeal are assessed equally to each party.

**DECISION OF COURT OF APPEALS AFFIRMED AS MODIFIED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED AND CASE REMANDED.**